## TINTIC MILLING CO. et al. v. INDUSTRIAL COMMISSION OF UTAH et al.

No. 3770.    Decided April 8, 1922.    (206 Pac. 278.)

1. MASTER AND SERVANT—DISABILITY FROM DISEASE CAUSED OR ACCELERATED BY ACCIDENT COMPENSABLE.   Under Comp. Law 1917, § 3112, subd. 5, disability from disease, either caused or accelerated to have such result, by an occurrence in course of employment which is an accident, is compensable.[1]

2. MASTER AND SERVANT—INJURY BY INHALING GAS "ACCIDENT"
   WITHIN COMPENSATION ACT. Injury to an employé, while work-
   ing on a special occasion, by inhaling gas, wholly unexpected
   by him, was caused by accident, within Workmen's Compensa-
   tion Act.[2]

Writ of review by the Tintic Milling Company and an-
other against the Industrial Commission of Utah and an-
other.

AWARD AFFIRMED.

*Bagley, Fabian, Clendenin & Judd,* of Salt Lake City, for
plaintiffs.

*H. H. Cluff,* Atty. Gen., and *J. Robert Robinson,* Asst. Atty.
Gen., for defendants.

THURMAN, J.

Clarence Snyder, an employé of plaintiff Tintic Milling
Company, on the 4th day of August, 1921, filed with the de-
fendant Commission application for an adjustment of his
claim for compensation for an alleged accidental injury aris-
ing out of or in the course of his employment. After a hear-
ing was duly and regularly had thereon the Commission
entered its findings of fact and conclusions in favor of the
applicant, and made its award in accordance therewith. Ap-
plication for rehearing was denied, and the case brought to
this court on writ of review.

The findings of fact and conclusions therefrom are as fol-
lows:

"I. That the applicant was employed by the Tintic Milling
Company on the 17th day of January, 1921; that on said date he
was assisting in putting in a bulkhead in the flue that carries the

---

[1] *Pinyon Queen Mining Co. & State Ins. Fund* v. *Industrial Com-
mission,* 59 Utah 402, 204 Pac. 323.

[2] *Amalgamated Sugar Co.* v. *Industrial Commission of Utah,* 56
Utah 80, 189 Pac. 69.

fumes from the roaster; that at this time the roasters were not entirely dead and were throwing off fumes; that the applicant was gassed, causing him to sustain bronchial irritation immediately after being gassed, followed by nausea and vomiting; that he became ill, continued to work, however, for several days; that by reason of being gassed the bronchial irritation kept up, and on the 5th day of March resulted in a profuse hemorrhage from the lungs; that in the month of May, 1921, the applicant had an examination made of the sputum, and the diagnosis showed active tuberculosis; that the gassing was either the direct cause of the tuberculosis or lighted up a dormant condition which existed previously, but did not incapacitate him for performing his duties as an employé.

"II.  That the smoke or fumes inhaled by the applicant while he was repairing the bulkhead in the flue were offensive; that he wore a respirator and a pair of tight-fitting goggles, and when he would go to take a breath the fumes would cut it off short; that when he first tried to enter the flue the gases were so dangerous and offensive that the applicant was compelled to wait about 30 minutes before he could enter the flue and commence his work.

"III.  That between January 1, 1920, and January 19, 1921, the applicant worked 356 eight-hour shifts out of a possible 384 shifts, missing only 28 shifts, but from the time he was gassed and within a few days thereafter he was unable to perform any labor whatsoever, and his condition grew worse from day to day.

"IV.  That on January 17, 1921, the Tintic Milling Company had in their employ three or more workmen; that on said date the Ætna Life Insurance Company was the insurance carrier for the said Tintic Milling Company.

"V.  That the wage earned by the applicant on the 17th day of January, 1921, was $26.25 per week, working seven days per week.

"VI.  That no compensation has been paid.

"VII.  That by reason of being gassed by accident the applicant was obliged to discontinue his employment on the 21st day of January, 1921, and has suffered total disability up to the 11th day of October, 1921, with probability of continuance of temporary total disability for some time to come."

"In view of the foregoing findings, the Commission concludes that the applicant on the 17th day of January, 1921, sustained an accidental injury arising out of or in the course of his employment, while regularly employed by the Tintic Milling Company at Silver City, Utah, an employer subject to the provisions of the Workmen's Compensation Act; that the Ætna Life Insurance Company or the Tintic Milling Company should pay to the applicant compensation in the sum of $14.37 per week, beginning on the 21st day of January, 1921 (three days after the injury) and to continue the payment of said compensation as provided in the Compensation Act, all accrued

payments to date to be paid to the applicant in a lump sum; also to pay for all reasonable hospital and medical attention and fees as provided in the Compensation Act."

The evidence before the Commission tended to show that on the 17th of January, 1921, and for some time previous thereto, the applicant, Clarence Snyder, was in the employment of the plaintiff Tintic Milling Company as a carpenter. On that day he, with another employé, was ordered to remove or change a bulkhead in a flue that carried the fumes from the roaster. When they first attempted to enter the flue the fumes were so strong that they could not go in, and had to wait about a half an hour. They then went in and removed the bulkhead, whereupon applicant became sick and went out and vomited. On his return he informed his companion of what had happened. He continued to work, however, for a period of three days, during which time he continued also to cough, and kept getting worse. On the fourth day after the occurrence he remained at home. He first saw Dr. Bailey on the 20th of the same month. He told the doctor where he had been working, and the doctor said the ailment was caused by the gas and fumes. Applicant did no work after that date. On the 25th of the same month he went to get his pay check and informed his employer of his condition. His employer told him to see Dr. Bailey, and have him prepare blanks for compensation. Several months prior to the occurrence of January 17th applicant had a light spell of "flu," which confined him to his bed for four days but he remained at home about a month until he regained his weight. For several years prior to the date of the alleged injury applicant had worked in and about the mines, sometimes in the plaintiff's mill on the rolls, also on the roaster, making repairs. He also worked underground in the mine part of the time and at other times was engaged in unloading and dumping coal for tramways and boilers. He commenced coughing right away after he was in the flue, and continued to cough thereafter, especially in stormy weather. He had a hemorrhage on March 5, 1920. Dr. Bailey told him it was caused by the constant coughing. His physical condition between April 20, 1920, when he had the "flu," and January 17, 1921, did not

interfere with his regular employment. Applicant and his companion put on respirators when they went into the flue. If they had not done so they could not have remained in the flue at all. A very noticeable change appeared in applicant's health after the incident referred to. With the exception of the first three days thereafter, he was never able to work at his regular employment.

At the time applicant and his companion went into the flue the roasters had not died down. They were still throwing off fumes. Dr. Bailey, who attended applicant when he had the "flu" in April, 1920, and also on January 20, 1921, after the alleged accident testified it was very probable an infection of the lungs started on the 17th of January, when he breathed the fumes. He also stated, in effect, that it might have started from influenza—it might have come from no cause, or it might have come from the alleged accident, but in view of the history of the case he was inclined to attribute starting the lung trouble to the gas. He was apparently well before that. He used to be husky. From January, 1921, he went down rapidly. Dr. Bailey, at the time of the hearing, was treating applicant for tuberculosis. There was a cavity in his lungs. With active tuberculosis, the cavity could have been formed between January 17th and March 5th, when the hemorrhage occurred. The doctor, however, stated he had not seen the X-ray pictures at the time he was giving his testimony. He was quite positive the occurrence of January 17th aggravated and accelerated whatever condition may have existed before, because prior to that time he was constantly employed, and there was no break in his health.

The expert opinion of Dr. Landenberger, a witness for plaintiffs, was generally to the effect that applicant, before January 17, 1921, was afflicted with pulmonary tuberculosis, and that the alleged accident of January 21, had little or nothing to do with the injury of which he complained. He admitted, however, that the occurrence of January 17, might have aggravated or accelerated the disease, but that it was by no means the starting point. In thus stating the effect of Dr. Landenberger's testimony, together with the conclusions

hereafter drawn therefrom, we assume that it is unnecessary to incumber these pages with a more elaborate statement. The court is of opinion that there is ample evidence in the record to sustain the findings of the Commission that the injury was either caused by the occurrence of January 17, or that said occurrence lighted up a dormant condition which previously existed, as found by the Commission.

But it is contended by plaintiffs that the injury in any event was not the result of an accident at all within the meaning and contemplation of the Industrial Act. As we read the record these are the questions submitted to the court for its determination. It must be conceded on the very threshold of the discussion that if Snyder's injury was due entirely to a pre-existing disease, whether such disease be occupational or otherwise, it cannot be regarded as an accidental injury, and is therefore not within the Industrial Act. The statute, Comp. Laws Utah 1917, § 3112, subd. 5, provides:

"The words 'personal injury by accident arising out of or in the course of the employment' shall include an injury caused by the willful act of a third person directed against an employé because of his employment. It shall not include a disease except as it shall result from the injury."

If plaintiff's contention is true, that the injury of which Snyder complains is but the continuation of a disease previously existing, unaggravated or unaccelerated by any fortuitous event which may be denominated an accident, then, in view of the statute quoted, the injury is not compensable and the award made by the Commission should be vacated, annulled and set aside. On the other hand, if the findings of the Commission are true, that the gassing in the flue in January, 1921, was either the direct cause of the tuberculosis or lighted up a dormant condition which existed previously, but which had not incapacitated him for performing his duties as an employé, then the award made by the Commission should not be disturbed unless it be determined as matter of law that the injury in question was not the result of an accident.

The writer is strongly inclined to the view that a fair and impartial interpretation of the evidence justifies the conclu-

sion that at the time of the occurrence of January 17, 1921, which the Commission in its conclusion denominates an accident, Snyder was afflicted with a disease described by the physicians as pulmonary tuberculosis, but that said disease did not seriously interfere with his regular employment, for it further appears from the evidence that between January 1, 1920, and January 20, 1921, Snyder worked 356 eight-hour shifts out of a possible 384, missing only 28 shifts during the whole period of time, thus demonstrating that, notwithstanding his disease, he was capable of performing the work of a man in normal health. It is also found, in the same finding by the Commission that within a few days after the alleged accident he was unable to perform any labor whatever, and that his condition grew worse from day to day.

In a very recent decision of this court, filed January 28, 1922, not yet officially published, it was held by the court that an accident which accelerated a pre-existing disease, rendering an employé incapable of continuing his regular employment, was compensable under the Industrial Act, where before the accident, said disease had not disabled him from continuing in said employment. *Pinyon Queen Min. Co. & State Ins. Fund* v. *Industrial Commission,* 59 Utah 402, 204 Pac. 323. The case referred to was thoroughly considered, and the reasoning of the court elaborate and exhaustive. Numerous authorities were cited and quoted from at considerable length, rendering it entirely unnecessary for the court in the present case to enter upon a discussion of the question therein settled and determined.

In that case, however, there was no question but that an accident had actually occurred which tended to accelerate and aggravate a pre-existing disease. In view of that decision, the only question remaining for our determination in the instant case is, Was the occurrence on January 17, 1921, an accident within the meaning of the Utah Industrial Act? Many authorities have been called to our attention by both plaintiffs and defendants in support of their respective contentions. With the exception of one case to which reference will be made later on, there has been no previous decision by

this court tending to throw any light upon the question referred to.

Plaintiffs rely on the following authorities in support of their contention that the injury complained of was not the result of an accident: Bradbury's Work, Comp. (3d Ed.) p. 317; Honnold Work. Comp. vol. 1, pp. 274-278, also section 138, relating to occupational diseases; *State Road Com.* v. *Ind. Com.*, 56 Utah 252, 190 Pac. 544, 545; *Brinton's Lim.* v. *Turvey*, 74 L. J., K. B. 474; *Liondale B. Dye & Paint Works* v. *Riker*, 85 N. J. Law, 426, 89 Atl. 929, in which many English cases are reviewed; *Adams* v. *Acme, etc. Works*, 182 Mich. 157, 148 N. W. 485, L. R. A. 1916A, 283, Ann. Cas. 1916D, 689, the opinion in which is an elaborate discussion of English cases, and also some decisions by the Massachusetts and New Jersey courts; *Perkins* v. *Jackson, etc. Co.*, 206 Mich. 98, 172 N. W. 374; *Ind. Com.* v. *Brown*, 92 Ohio St. 309, 110 N. E. 745, L. R. A. 1916B, 1277; *Miller* v. *American S. & W. Co.*, 90 Conn. 349, 97 Atl. 345, L. R. A. 1916E, 510; *Jerner* v. *Imperial Furniture Co.*, 200 Mich. 265, 166 N. W. 943; *Steele* v. *Cammell, etc., Ltd.*, 2 K. B. 232; *Prouse* v. *Ind. Com.*, 69 Colo. 382, 194 Pac. 625. In nearly all the cases cited by plaintiffs compensation was denied because the injuries for which compensation was sought were held to be occupational diseases, and therefore not compensable except where expressly authorized by the statute. We have already stated that under our statute no compensation can be allowed for a disease except where the disease is the result of an accident. It is unnecessary therefore to indulge in a detailed discussion of cases in which there was no accidental injury. As to that question the statute is conclusive. There is, however, some discussion among the authorities cited by plaintiffs as to what constitutes an accident. These authorities, of course, are material to the question presented here.

The citation from *Honnold*, supra, contains the following definition:

"The word 'accident' refers to the cause of the injury, and it is here used in its ordinary and popular sense, as denoting an unlooked for mishap, or an untoward event, which is not expected or designed by the workman himself, as a physiological injury as a

result of the work he is engaged in, an unusual effect of a known cause, a casualty. It implies that there was an external act or occurrence which caused the injury or death. It contemplates an event not within one's foresight and expectation resulting in a mishap causing injury to the employé."

Some of the statutes of this country award compensation for personal injury and others for injury resulting from accident. In the former. compensation is generally allowed for occupational diseases. This, however, is not universal. In the latter compensation for occupational diseases is generally denied. Bradbury, supra, 317.

Where there is any attempt to define the meaning of the word "accident," as used in compensation acts, the cases cited by plaintiffs are generally in accord with the definition given by Honnold. What is termed an accident must be something out of the ordinary, unexpected, and definitely located as to time and place. If the injury is incurred gradually in the course of the employment, and because thereof, and there is no specific event or occurrence known as the starting point, it is held to be an occupational disease, and not an injury resulting from accident. Such, in the opinion of the writer, is the rule, well sustained by both reason and authority, and is not seriously controverted by any well-considered case cited by either of the parties in the instant case.

The following cases are relied on by defendants; *State Ind. Com.* v. *Roth et al.*, 98 Ohio St. 34, 120 N. E. 172, 6 A. L. R. 1463. The same case is reported in Workmen's Compensation and Negligence Cases, vol. 17, at page 342, in which the syllabus succinctly states the nature of the case and the points decided:

"1. A disease contracted in the natural and ordinary course of employment, by a person engaged in a particular calling or occupation, which disease from common experience is known to be a usual and customary incident to such calling or occupation, is an 'occupational disease,' and not within the contemplation of the Workmen's Compensation Law. * * *

"2. The accidental and unforeseen inhaling by an employé, in the course of his employment, of a specific, volatile poison or gas, resulting in injury or death, is not an 'occupational disease.'"

In *Walsh* v. *River Spinning Co.*, 41 R. I. 490, 103 Atl. 1025,

13 A. L. R. 956, the third paragraph of the syllabus tersely states the facts and holding of the court:

"A fireman employed in a boiler room, who in the afternoon was overcome by excessive heat and afterwards taken to a hospital, where he died the following morning from heat and exhaustion, died as the result of 'personal injury sustained by accident' within Workmen's Compensation Act, and not disease of heat exhaustion or from occupational disease; the word 'accident' as used in the various compensation acts not being one of precise meaning."

In *Tarr* v. *Hecla Coal & Coke Co.*, 265 Pa. 519, 109 Atl. 224, three questions were involved: (1) As to whose servant the employé was; (2) whether the injury was accidental within the Pennsylvania Industrial Act (Pa. St. 1920, § 21916 et seq.); (3) whether the employment was regular or merely casual. The court held:

"Where a mining company, according to custom, on request, loaned a regular employé to another company to assist in extinguishing a fire, subject to the control of the latter company, it became his temporary employer though his wages were not fixed, and therefore his death by asphyxiation while at work was the result of an accident in the course of his employment with it, justifying an award against it under the Workmen's Compensation Act."

In *Patrick* v. *J. B. Ham Co. et al.*, 119 Me. 510, 111 Atl. 912, 13 A. L. R. 427, where the evidence showed that a deceased employé who died from cerebral hemorrhage suffered the first stroke while lifting grain sacks, and there was expert testimony that the increased blood pressure thereby occasioned might have ruptured the blood vessel weakened by disease, it was held sufficient to sustain a finding of the chairman of the Industrial Accident Commission that the death was caused by an accident arising out of the employment.

In *Carroll et al.* v. *Ind. Com. of Colorado*, 69 Colo. 473, 195 Pac. 1097, the court reversed the holding of both the Commission and the district court, denying compensation to the dependents of an employé, and held that where the deceased had organic heart trouble and the strenuous work of pitching alfalfa hay in an inclosed building, combined with breathing dust-laden air, brought on an attack of heart trouble causing instant death, the condition of the air or the fact that it was

dust-laden was the proximate cause of the accident. It was also held that the result, being unexpected and unintended, was therefore an accident within the meaning of the Colorado Industrial Act (Laws 1919, c. 210).

In *Gilliland* v. *Ash Grove Lime & Portland Cement Co.,* 104 Kan. 771, 180 Pac. 793, an employé working in a rock quarry with a 16-pound sledge and loading rock into a car suffered a pulmonary hemorrhage, from which he died before medical aid could reach him. At noon he was in good health and spirits, and ate a hearty lunch. In the afternoon he was seen beating a large rock with his sledge. Shortly thereafter he suffered a hemorrhage and died as above stated. Prior to that he had worked for three years in the sacking department of a cement plant, where it was exceedingly dusty. The court held the injury was the result of an accident within the meaning of the Kansas Act (Laws 1911, c. 218).

*Utilities Coal Co.* v. *Herr et al.,* 132 N. E. 262. The case was decided by the Indiana Appellate Court in October, 1921, and in principle is so strikingly similar to the case at bar we are constrained to quote from the opinion one or more excerpts which disclose the nature of the case and the reasoning of the court. At page 262 it is said:

"The evidence tends to show that on June 26, 1920, appellant had a number of men employed in mining coal, including the decedent. On the morning of that day, the decedent, with other employés of appellant, went down into its mine to engage in their usual work. When they reached the bottom of the mine and came to their working place, they found the same so full of smoke that they could not remain therein with comfort or safety, and by reason of that fact returned to the top of the mine. Immediately after the decedent came out of the mine, he walked a short distance to a stairway, sat down on one of the steps, and then fell over. On being carried into the office he was found to be dead. On examination at an autopsy held by the coroner, it was found that the decedent had been afflicted with a serious chronic heart disease. The smoke which caused the decedent and other employés of appellant to leave the mine had been produced by firing explosives early that morning for the purpose of loosening the coal, so that it could be more easily and more rapidly mined, and sufficient time had not elapsed for the air to become pure again before the men went down to work."

After holding an occurrence which merely hastens an exist-

ing disease to its final culmination to be an accident within the meaning of the Industrial Act of Indiana the court, at page 263, says:

"There is no direct evidence that the smoke-laden air, inhaled by the decedent on the occasion in question, hastened his death because of the diseased condition of his heart, but such evidence is not necessary in order to establish that fact, if other proven facts will warrant such an inference. *Bronnenberg* v. *Indiana, etc., T. Co.* (1915) 59 Ind. App. 495, 109 N. E. 784; *Carter* v. *Richart* (1917) 65 Ind. App. 255, 114 N. E. 110. Directing our attention to the facts set out above, we observe that a man, afflicted with a serious heart disease, went down into a mine, and found the air of his working place filled with smoke, that rendered it unfit to breathe, and seriously affected a number of his fellow workmen; that, after remaining a short time he left the mine because of the impure air, and on reaching the top he was in such condition that he expired within a short time. It was the province of the Industrial Board to draw any reasonable inference from such facts. It evidently drew the inference that the same elements in the air of the mine, which caused other workmen to become weak, dizzy, and blind, to have rapid pulsations, headache, and shortness of breath, to become sick and vomit, so affected the decedent that death followed, because his diseased heart was unable to withstand the added burden placed on it by inhaling the smoke-laden air while in the mine, and in making an effort to escape from its evil effects. With such an inference in support of the finding in question, it is fully sustained by the evidence. We are unable to say that it is not a reasonable inference, and therefore we have no right to disregard it, although we might consider a contrary inference equally as reasonable"—citing cases.

The Workmen's Compensation Act of Indiana, 1915, c. 106, § 2, provides in part:

"From and after the taking effect of this act, every employer and every employé, except as herein stated, shall be presumed to have accepted the provisions of this act respectively, to pay and accept compensation for personal injury or death by accident arising out of and in the course of the employment, and shall be bound thereby."

It certainly will be conceded that many of the cases just reviewed, in principle at least, very much resemble the case at bar. It is exceedingly difficult to make a distinction without splitting hairs and indulging in subtle refinements which no court charged with the administration of justice is justified in doing under statutes which require a liberal interpretation.

The writer is strongly impressed with the view that the following excerpt quoted with approval by the court in .*Carroll* v. *Ind. Com.*, supra, from 25 Harvard Law Review, 340, is a correct interpretation of the law in this class of cases:

"Since the case of *Fenton* v. *Thorley*, nothing more is required than that the harm that the plaintiff has sustained shall be unexpected. * * * It is enough that the causes, themselves known and usual, should produce a result which on a particular occasion is neither designed nor expected. The test as to whether an injury is unexpected, and so, if received on a single occasion, occurs 'by accident,' is that the sufferer did not intend or expect that injury would on that particular occasion result from what he was doing."

We have yet to consider a decision by this court to which reference was made near the beginning of our reveiw of the authorities. *Amalgamated Sugar Co.* v. *Ind. Com. of Utah*, 56 Utah 80, 189 Pac. 69, is a case in which an employé came to his death by inhaling carbon monoxide poison while working in a lime kiln at the plaintiff company's factory. The Commission treated the occurrence as an accident rather than a disease, and awarded the dependents of the employé compensation. This court on application by writ of review affirmed the award. The facts of the case as reported in the opinion of the court, at page 82, 56 Utah, pages 69, 70, 189 Pac. are as follows:

"The testimony shows that the decedent, Benson, was, at the time of the alleged accident, a common laborer, 58 years of age, residing with his family at Newton, Utah, about six miles distant from the sugar factory of petitioner Amalgamated Sugar Company. In the evening of December 13, 1918, he walked from his home to the sugar factory, where he was employed, and went to work at 9:30 p. m.; wheeling lime with a wheelbarrow from a limeroom out of a large kiln, cylindrical in form, which extended from the floor to the ceiling in said room. Near the top the kiln was provided with an iron pipe for carrying off the gases generated in the burning of the lime rock with coke. At the bottom of the kiln was an opening for shoveling out the lime when burnt. The testimony shows that carbon monoxide gas was generated by the burning process, and a pump was operated for the purpose of drawing off from the burning lime the gases thus generated. If the pump stopped or the kiln fires became low, gases escaped into the room. According to the testimony, when these gases escaped into the

kilnroom the lives of the employés were menaced, and it became
necessary for them to vacate the kilnroom. Benson commenced his
work at 9:30 o'clock in the evening, and continued until about 1
o'clock the following morning, when he stopped to eat his lunch.
When not engaged in wheeling lime from the kiln he sat in his
wheelbarrow near the base of the kiln. About a half hour after
eating his lunch, or at 1:30 o'clock a. m. he was taken violently
ill and suffered greatly with pains in his chest and arms. His fel-
low employés then took him home, where he continued to suffer
in the same way for four or five hours longer, when he died. Sub-
sequently a post mortem examination was made by Drs. E. P.
Oldham and H. K. Merrill, upon the result of which they expressed
their opinion that the decedent had died from carbon monoxide
poisoning contributed to by 'coronary sclerosis,' but that the im-
mediate cause of death was carbon monoxide."

In the case just referred to, the employé was killed by in-
haling carbon monoxide poison generated in a lime kiln, while
in the instant case the employé was injured by inhaling gas
generated in a flue. In each case the injury was traceable to
a particular time, place, and circumstance, and was therefore
properly treated as an accident.

Another case somewhat similar in principle was decided by
the defendant Commission at a later date, and brought to this
court on writ of review. The question, however, was not de-
termined by this court, but was disposed of on another point.
The case referred to is *Heiselt Const. Co.* v. *Ind. Com.*, 58
Utah 59, 197 Pac. 589, 15 A. L. R. 799. The following are
the findings upon which the Commission based its award:

"III.  That on the 10th day of Jauary, 1920, David Murphy, of
Salt Lake City, state of Utah, was injured by accident arising out
of or in the course of his employment, while engaged in the usual
course of his trade, business, profession, or occupation of the de-
fendant employer of Provo Canyon, state of Utah.

"IV.  That said injury was caused from being exposed to se-
verely cold weather while at his work on January 10, 1920, which
resulted in the ends of several of his fingers becoming frozen and
later reqiring the amputation of right thumb at distal joint, right
first finger one-half distal phalanx, right second finger one-half
distal phalanx, right third finger three-fourths distal phalanx, left
fourth finger three-fourths distal phalanx."

It is not necessary to prolong the discussion. Being con-
vinced, as I am, that Clarence Snyder, the employé in this

case, on the 17th day of January, 1921, at a definite time and place, while in the course of his employment, received an injury by inhaling gas, wholly unexpected by him, **2** and that such injury aggravated and accelerated a preexisting disease and rendered him wholly unable to thereafter continue his usual employment, I am of the opinion that the findings, conclusions, and award of the defendant Commission should be affirmed, with interest on payments past due, at plaintiffs' costs.

CORFMAN, C. J., and WEBER and GIDEON, JJ., concur.

FRICK, J. I have had much difficulty in arriving at a conclusion in this case. I have always entertained much doubt as to whether the injury from which the applicant, Mr. Snyder, is suffering is the result of an accident within the purview of our statute. As I read the evidence the work in the flue was done in the usual and ordinary way. The gases in the flue were known to be there, and the purpose for which the flue was constructed was to carry off the gases, and thus make them harmless. Mr. Snyder and his companion, on entering the flue, expected to encounter the gases, precisely the same as they would have expected to meet the cold air on an unusually cold day in midwinter by leaving a heated room to go into the open air to do some work. If under such conditions one or the other had contracted a severe cold, I cannot see how that cold could be said to be the result of an accident. So here, the mere fact that Mr. Snyder was affected by the gases in the flue contrary to his expectations cannot constitute an accident. If something had gone wrong with his respirator, or if something unexpected or unforeseen had happened in the flue causing an excessive amount of gas to be present, or if Mr. Snyder had been accidentally tripped or had fallen by reason of which his respirator had become displaced, and he had thus inhaled an excessive amount of gas, there would be at least some basis for the contention that there was an accident. The mere fact, however, that he was

affected by the gases in the flue, as I view it, does not constitute an accident.  While it is true that an accident is "an
event not within one's foresight and expectation resulting in
a mishap causing injury," it is not every unexpected consequence or result that constitutes an accident.  As I view it,
if an accident actually occurs it exists as such whether any
injury results therefrom or not.  The injury is not the accident, but it is merely the result of the accident.  In this case,
as I see it, if there was an accident Mr. Snyder's companion,
who was with him in the flue, must also have suffered an
accident, the only difference between him and Mr. Snyder
being that the former escaped without injury, while the latter did not.  Mr. Snyder's companion was, however, not subjected to an accident, and if he was not I cannot see how Mr.
Snyder was.  The mere fact, therefore, that Mr. Snyder was
deleteriously affected by the gases in the flue is assumed as
constituting the accident in this case.  The consequential injury is therefore taken as constituting the accident.  In view,
however, that all of my associates have arrived at the conclusion that Mr. Snyder met with an accident within the meaning of our statute, and that his ailment is the result of that
accident either in whole or in part, I must be wrong in my
conclusion.  I therefore yield to the judgment of my associates, and for that reason concur in their conclusion.