MILAS J. RUE, APPELLANT, v. EAGLE-PICHER LEAD COMPANY, RESPONDENT.*—38 S. W. (2d) 487.

In the Springfield Court of Appeals. Opinion filed April 3, 1931.

*Thomas J. Roney* for appellant.

*John Campbell, A. E. Spencer* and *A. E. Spencer Jr.,* for respondent.

COX, P. J.—Milas J. Rue, appellant, contracted lead poisoning while in the employ of respondent and filed a claim for compensation under our Workmen's Compensation Statute. The commissioner found in his favor and made an award for him. The respondent appealed to the circuit court, where, upon presentation of the finding of the commission and the evidence on which such finding was based, the court held no case was made by the claimant and reversed and quashed the award of the commission and discharged the defendant. The claimant appealed to this court.

The award of the commission was set aside and quashed because the circuit court was of the opinion that the evidence taken at the hearing before the commission was not sufficient to sustain the award and whether the court was right in that holding is the only question upon which we are required to pass.

It is a familiar rule of law and conceded in this case that the finding of the commission stands upon the same footing as the verdict of a jury and if there is any substantial evidence to sustain it, the court must uphold it. It is also conceded that in determining whether the evidence will sustain the award the claimant must be given the benefit of all the evidence in his favor. There is no conflict in the evidence except some slight difference of opinion between physicians who testified as experts. The facts are substantially as follows: Until this alleged accident, the claimant was in good health; had never had any trouble with his stomach and his physical condition

was good in every respect. It was conceded that his work required him to work in a room where lead dust was in the air and it was necessary for him to wear a mask to protect him in breathing in order to prevent breathing the lead dust which was recognized as dangerous to health and these masks were provided for that purpose by the employer. The claimant in detailing what occurred at the time of the alleged accident stated: "On the evening before I went to packing the paint, I went down to the stock room and got a muzzle (mask). The muzzle seemed to be dry and it seemed like it had been lying on the shelf and it was hard and some one else had used the muzzle. I washed it out in boiling water in the lavatory and cleaned it and went to work a little while and could not draw my breath. It was too large for my face. It had a piece of inner tube of an automobile sewed on it in this way (indicating) and I put it on and it hung loose on my face. It was too big for my mouth. When I would breathe, in place of coming through the sponge, it would come out here on the side. The other man's head was bigger than mine and it would drop down here as I would swing my head down in shoveling and let air come down on me and I went and washed it again and went back and I got sick at my stomach and I just kept getting sick and I went out and got another drink. I shoveled maybe an hour longer when everything turned black on me and spotches in front of my eyes and I began to stagger and had to quit and went home. I took cramps; got nervous and went on that way at home for two weeks when I fell over and woke up in Freeman Hospital."

Dr. McCormack, a physician, called by claimant, testified: "I visited Mr. Rue July 28, 1928, when his condition was nervous; complained of pains in his stomach and in his head. He had typical blue lines on his gums; soreness over his whole abdomen; unable to stand steady on his feet, in short, almost all the signs of lead poisoning." This doctor was asked this question: "Q. Where one has worked around a lead plant for a space of three weeks, sometimes tying sacks of paint, sometimes wheeling cans of paint around and for three and one-half hours of this time in a room where they were bolting paint and during these three and one-half hours became violently ill and sick, is that condition of sickness due to the natural taking in of white lead so as to make it a natural sickness growing out of handling of paint or would it be due to an excessive amount at one time?" To which he answered: "I would say it would be due to an excessive amount at one time." Also "Q. Doctor, how long does it take when working around white lead to become inoculated with white lead so as to bring the condition you found Mr. Rue in at this time ordinarily? A. I believe ordinarily it takes longer than a year. Q. If his health was good, never complained of any

of this nervousness; never complained of any pains in his stomach or any suffering of the stomach prior to June 17, 1928, would it be possible for one to receive an excessive amount of paint (white lead) to put in this condition in one day? A. It would be. Q. Doctor, in order for white lead poisoning to develop in the usual and ordinary way, what are the symptoms? A. His first attacks are rather light. He probably becomes dizzy for a few minutes and usually complains of a blurred vision and later on occurs the first symptoms that cause the cramps in the stomach. If they have worked for a long period of time in a smelter, usually the stomach is the first thing they complain of. It is my experience they have a number of light attacks long before they even get to where they are indisposed and in my opinion it would take longer than a year. The first symptoms would be very light and he could continue to work. In the ordinary and usual and natural way he wouldn't receive any of these ill effects for a year after he began to work at a white lead plant. That is usually the case. That is the usual and average result.''

This evidence was taken before Commissioner Orin H. Shaw, who made a temporary award to claimant on December 21, 1928. On February 11, 1929, further testimony was heard by Commissioner Shaw. Claimant testified that he was not then able to work and was still under the care of Dr. McCormack. Dr. McCormack then testified that claimant had been under his care since the last hearing and he did not know that he could yet do any work.

Dr. Cummings, for defendant, testified that he examined claimant February 10, 1929, and found an average case of lead poisoning. That there is no rule as to the time within which a person exposed to lead fumes may develop lead poisoning. It all depends on the amount. On cross-examination he was asked: ''Q. What would you say if a man who had never suffered any pains in his stomach; had never had any dizziness or any symptoms of lead poisoning until it came suddenly on him one morning while he was working? A. In cases of that kind I would naturally say he got an over-dose.'' Dr. Coombs was also called by defendant but added nothing to contradict the other doctors or the claimant.

The foregoing is in substance the evidence as shown by appellant's abstract of the record. The respondent has furnished an additional abstract of the record in which the cross-examination of the claimant is set out at length and from that we learn that the claimant knew of all the conditions in the room where he was working at the time he says the alleged accident occurred and it had lead dust in it all the time and he and others were required to wear masks when they worked in the rooms and the conditions were the same on the day of the alleged accident as on other days. The defendant furnished the masks for the men to wear. If there was anything

wrong with the mask or if it did not suit the man, it would be his business to go to the stock room and get another.

After the evidence was all in, the full commission made an award to the claimant.

There can be no doubt in this case that the claimant, Rue, contracted lead poisoning while at work in the performance of his duty as an employee of defendant. The only question here is whether the disease of lead poisoning with which he became afflicted resulted from an accident or resulted from the nature of the work in which he was engaged. If the latter, there can be no recovery, for the reason that occupational diseases are specifically excepted by our statute. If the disease followed as the result of an accident, then the award of the commission should stand. Our statute, section 3305, Revised Statutes 1929, (b), defines the word accident and injury resulting therefrom as follows: "The word accident as used in this chapter shall, unless a different meaning is clearly indicated by the context, be construed to mean an unexpected or unforeseen event happening suddenly and violently with or without human fault and producing at the time, objective symptoms of an injury. The term injury and personal injuries shall mean only violence to the physical structure of the body and such disease or infection as naturally results therefrom." A disease which results from an accident is clearly included in the statute and it is not contended in this case that if the disease of lead poisoning, with which Mr. Rue was afflicted, resulted from what can be defined as an accident, he should recover.

The respondent calls attention to the fact that lead dust was at all times present in the room where Mr. Rue worked and the conditions on the day he became sick were exactly the same as on every other day and from that premise reasons that the disease must have resulted from the nature of the work and the conditions under which he worked and hence cannot be traceable to an accident. Appellant contends that on this occasion there was one condition present that did not obtain generally and that was the fact that the mask worn by Mr. Rue was furnished for his protection so that he would not inhale the lead dust that was known to be present in the room, did not fit his face and as a result lead dust in sufficient quantity to cause the disease was inhaled by him, while if the mask had properly fitted his face it would have furnished the protection which it was designed to furnish and the disease would not have been contracted. The evidence which we have quoted fully sustains appellant's contention as to the facts. Mr. Rue was in good health in every way when he began working in the room on that day. By reason of the mask not fitting his face, he inhaled an excessive amount of dust which made him sick when he had worked no longer than three

and one-half hours. This sickness proved to be the result of that excessive inhalation of lead dust. If this were an ordinary action for damages in which contributory negligence could be used as a defense, there might be some ground to say that it was the duty of Mr. Rue to select a mask that properly fitted him but the statute excludes consideration of the negligence of any person whatsoever. The disease of lead poisoning with which Mr. Rue was afflicted was the result of an accident or was an occupational disease. To be the result of an accident, it must, as the statute provides, have resulted from "an unexpected or unforeseen event happening suddenly and violently with or without human fault and producing at the time objective symptoms of an injury." That the contraction of lead poisoning by Mr. Rue came from the inhalation by him of lead dust which produced at the time objective symptoms of an injury cannot be denied. The sickness which immediately followed furnished all the objective symptoms of injury that were necessary. It also shows that the effect of the inhalation of gas by Mr. Rue was violent. This leaves for consideration the questions, did this sickness result from an event that was unexpected and unforeseen and did this event happen suddenly? If these questions are answered in the affirmative, then every requirement of the statute has been fully met. In the regular course of the work in handling lead powder in that room, it was necessary for the workmen to wear masks to prevent inhaling lead dust. Mr. Rue wore a mask while he worked there. This mask was too large for him. He testified "When I would breathe, in place of coming through the sponge, it would come out here on the side . . . and it would drop down here as I would swing my head down in shoveling and let air come down on me." Evidently Mr. Rue did not expect the use of this mask to make him sick or he would not have used it. Certainly the event of his inhaling a dangerous amount of lead dust while using this mask was unexpected to him and, of course, the dropping down of the mask as he worked and the letting in of an excessive amount of lead dust by reason thereof as well as by reason of the mask being too large for his use was sudden. In our judgment, every requirement of the statutory definition of an accident was fully met by the testimony in this case and the finding of the commission was well sustained by that testimony.

Our statute, as do the statutes of most other states, tries to define what is meant by the term accident but still the courts find it necessary to construe what is meant by the statute. [See Brewer v. Ash Grove Lime & Portland Cement Co., 25 S. W. (2d) 1086, by this court; Drecksmith v. Universal Car Loading & Distributing Co., 18 S. W. (2d) 86, by the St. Louis Court of Appeals.]

As to what is meant by the word accident as used in Workmen's Compensation Statutes in other states, we are cited by appellant

to the following: Peru Plow Co. v. Industrial Commission, 311 Ill. 216, 142 N. E. 546; Townsend v. Tagart, 81 Ind. App. 610, 144 N. E. 556; Gilleland v. Edgar Zinc Co., 112 Kan. 39, 209 Pac. 658; Van Vleet v. Public Service Com., 111 Nebr. 51, 195 N. W. 467; Tintic Milling Co. v. Ind. Com. (Utah), 206 Pac. 278.

Respondent cites us to the following cases: Chop v. Swift &. Co., 118 Kan. 35, 233 Pac. 800; St. Louis M. & S. Co. v. Ind. Commission, 113 Okla. 179, 241 Pac. 170; Thomas v. Ford Motor Co., 114 Okla. 3; 242 Pac. 765; Bamburger Coal Co. v. Commission of Utah, 66 Utah, 203, 240 Pac. 1103; Meade Fibre Corp. v. Starnes, 147 Tenn. 263, 247 S. W. 989; Hoag v. Kansas Ind. & Laundry Co., 113 Kans. 513, 215 Pac. 295; Taylor v. Swift & Co., 114 Kans. 431, 219 Pac. 517; Linnane v. Aetna Brewing Co., 91 Conn. 158, 99 Atl. 507; Jerner v. Imperial Furn. Co., 200 Mich. 265, 166 N. W. 943; Depre v. Pacific Coast Forge Co. (Wash.), 259 Pac. 720; Echord v. Rush (Kans.), 261 Pac. 820; Lerner v. Rump Bros., 241 N. Y. 153, 149 N. E. 334; Milling Co. v. Ind. Com., 60 Utah, 14, 206 Pac. 278.

We have read all these cases and find that in a general way they agree that the words used in these statutes are to be given their usual and ordinary meaning and the statute is to be liberally construed in favor of the injured workman. They also agree that it is difficult to formulate a definition of the word "accident" as used in these statutes that will fit every case but each case must stand upon its own facts.

Our conclusion is that the facts in this case are sufficient to sustain the award of the Commission and the trial court was in error when it quashed that award.

The judgment will be reversed and the cause remanded with directions to set aside the judgment entered and enter judgment sustaining the award of the Commission. *Smith, J.,* concurs; *Bailey, J.,* dissenting.

BAILEY, J. (dissenting).—I am unable to agree with my learned associates in holding that the injury to claimant was the result of an accident within the meaning of the Workmen's Compensation Act. The event to be an accident must be "unexpected," "happening suddenly and violently." [Sec. 3305, R. S. 1929.] Claimant testified he knew he was not getting air through the sponge on the mask; that the mask did not fit his face; that he left the room several times to wash the mask or his face and returned knowing that the inhaling of the dust through the ill-fitting mask was making him sick.

While the element of negligence is not involved, nevertheless, such evidence does not indicate an unexpected, sudden or violent event. The most that can be said is that claimant, by using an ill-fitting

mask, produced a result upon himself in a few hours, similar to the result usually manifested in a period of about one year. But the sickness was not the result of violence nor was it sudden, as I understand the term. Moreover, it was exactly the same disease (lead poisoning) which is the usual result of working in such places as the one in question for a period of a year or more. It was then an occupational disease, although contracted in much less than the usual time. But its nature could not be changed by the shortness of the time within which it was contracted. Such diseases are exempted from the provisions of the Workmen's Compensation Law. [Sec. 3305, supra.] Claimant was fully protected under the provisions of Sections 13253 and 13254, Revised Statutes 1929, relating to means and methods of preventing occupational diseases. He had a cause of action saved to him by the Workmen's Compensation Law and specifically exempted from its provisions.

It is therefore my opinion the judgment of the circuit court should be affirmed.