GLADDEN DAUGHERTY, RESPONDENT, v. CITY OF MONETT AND WESTERN CASUALTY AND SURETY COMPANY, APPELLANT.—192 S. W. (2d) 51.

Springfield Court of Appeals.   January 11, 1946.

Rehearing Denied.   February 2, 1946.

*James E. Sater* for appellants.

926

928

930

*E. C. Medlin, H. A. Gardner* and *Gene Frost* for respondent.

VANDEVENTER, J.—This is an appeal from the judgment of the circuit court of Lawrence County affirming an award by the Workmen's Compensation Commission. Gladden Daugherty, the respondent herein, was a night policeman in the City of Monett. About 3:30 a. m., March 23, 1943, he was shot by Earl Johnson, another policeman of that city. The evidence of respondent showed that the city had been divided into two sections for patrol duty. Johnson patrolled what was known as the east section and Daugherty patrolled the western part. The dividing line was about two or three blocks east of where the shooting occurred and consequently was in Daugherty's territory. Another policeman on the night force was Oliver Nixon. Johnson and Daugherty worked nine hours each night beginning about 8 o'clock. Nixon went to work at 11 o'clock p. m. and his duties did not seem to be confined to any particular section of the city but, as testified to by Chief of Police McDonald, his duties were in the business district "in the heavy part of the night" when the most robberies occurred. It had been the practice that if some emergency arose, either Johnson or Daugherty could be called from his usual beat to assist anywhere in the city but under ordinary circumstances, each was supposed to stay in his respective territory.

On the night of the shooting, Daugherty had been riding around his section of the city with one Acuff in the latter's car. On the south side of the Frisco tracks and in the west side of the city, in Daugherty's section was a small house, referred to as a "shanty" for a watchman of the Frisco Railroad. This shanty was south of the tracks and a short block north of it was a building and private filling station owned by Mayor Hall, who, in addition to his official duties, was engaged in the wholesale business. It had been the approved custom of the policemen for years to go frequently to this watchman's shanty to receive reports from the watchman as to whether he had observed any law violations or suspicious characters in that portion of the city. The Chief of Police had also frequently done this. The watchman's active duties did not take up all of his time. He was only busy when trains were passing across the street near his shanty and he had been instructed to cooperate with the officers and to report to the police any suspicious persons or circumstances that he observed. On the night in question Daugherty had come to this shanty twice before the shooting occurred. Johnson had that night reported to the watchman that Mayor Hall's gasoline pump was unlocked and the watchman had in turn reported this Daugherty. Daugherty said he would look after it and immediately went up to the pump with Acuff, parked the car near the pump and was there for approximately five minutes. The pump was between the car and the shanty and in

plain view of the watchman. Johnson left his section of the city and came over to the filling station where Daugherty and Acuff were parked, in Daugherty's section, and had a conversation with them about whether the pump was locked and whether the electric power was on so gasoline could be obtained from the pump. Daugherty contended that the electricity was off and that gasoline could not be obtained and Johnson took the opposite view. A demonstration proved Johnson to be correct. Johnson accused Daugherty and Acuff of stealing gasoline which they denied. The watchman and Acuff testified at the trial that there was no attempt to steal gasoline. It was Daugherty's duty to patrol the west half of the city, watch for law violators, see that doors were locked, windows closed and that the property therein was protected from prowlers. Between one hour and an hour and a half, after meeting Johnson at the filling station, Daugherty again arrived at the watchman's shanty. He went in, took off his overcoat, sat down by the fire to warm and was talking to the watchman when Johnson and Nixon drove up. Johnson asked if Daugherty was in the shanty and being informed that he was, asked him to come out. Daugherty asked Johnson to come into the shanty but upon again being invited out, complied with the request and stepped out of the door, which was in the north end of the shanty, and as he did so, Johnson said that he didn't like the way Daugherty was running things in this end of town and upon Daugherty saying he didn't know what was meant, called him a God damned liar, and struck him on the head with his revolver. (Johnson had previously complained to the Chief accusing Daugherty of disconnecting the speedometer of the police car and using it as a taxi.) Daugherty threw up his hands to protect himself, staggered away from Johnson in a northeasterly direction across one railroad track, asked Johnson not to hit him any more and then Johnson fired at Daugherty, hitting him about two inches below his left arm and on the back portion of his left side. The bullet went through the body and lodged under the skin on his right side, below the shoulder. Daugherty fell to the ground and in a few minutes was placed in an ambulance and taken to a hospital at Aurora, where he remained for nine days. He was then taken to a hospital in St. Louis and there stayed until the 28th of May, when he was brought back to his home in Monett. His testimony was taken at his home while he was confined to his bed. The shot paralyzed Daugherty's body from his waist down and from the time of the shooting until he testified on the 17th of December, 1943, he had no feeling in the lower part of his body and could not move his legs in any manner. He had no control over the action of his bowels or kidneys, in fact, had no sensation indicating when they were going to or had functioned. It was necessary to change his bed clothing and his clothing five or six times a day and to keep

some one in attendance 24 hours a day. Each morning his legs were washed with alcohol and massaged, an electric heating light was used on each leg for about twenty minutes each day and an electric vibrator was also used each day in an effort to relieve the paralysis. He had a suppurating bed sore on his back which at first covered nearly all of that part of his body, but on the 17th of December, when his testimony was taken, it had been reduced but was still larger than the bottom of a pint cup and its condition would necessitate hospitalization of skin grafting. It was necessary for his attendants to dress this sore four times daily and apply penicillin. It was also necessary to give him anti-pain medicine at two hour intervals. He was unable to leave his bed, his meals were served there and he could only move his body by the aid of an iron bar attached to his bed and extending over his head. Since the injury he had not been left unattended, by either his father or his wife, even for short periods of time and the doctor visited him once each day and sometimes twice. The uncontradicted evidence conclusively showed Daugherty to be a helpless and hopeless cripple, but receiving continuous and capable nursing and care by his wife and father. There was evidence that the reasonable value of the service which was rendered by his wife and his father in caring for him was between $6 and $9 per day. The doctor's bill at the time of the hearing was $508, which did not include a $75 rental for the electric massage or shock machine.

The evidence on the part of the city and its insurer, the Western Casualty and Surety Company, was that, in some way, during the late evening before the shooting, police officer Johnson had discovered that the Mayor's filling station pump was unlocked. He so informed the watchman with instructions to tell Daugherty, which the watchman did, and after receiving the information, Daugherty and Acuff drove up to the filling station, ostensibly to see about the lock. Johnson testified that they were in fact stealing gasoline from the Mayor's pump and that he caught them in the act. They had some argument about it and Johnson went back up town to get Officer Nixon; that some forty minutes later with Officer Nixon, he drove up to the watchman's shanty, called Daugherty out and told him he was under arrest; he intimated that his assault of Daugherty was caused by his fear that Daugherty would resist Johnson in making the arrest. In testifying about the occurrence at the shanty immediately prior to the shooting and referring to Daugherty, Johnson said, "He said there wasn't anybody that could arrest him and he refused to be arrested."

Upon being asked what, if anything, Gladden Daugherty did to indicate that he was going to resist arrest, an objection was made by Johnson that an answer might incriminate him and his objection was sustained by the referee.

934

There was evidence also that Daugherty and Acuff were seen at the gasoline pump at about 2:30 before the shooting, their car parked at the side of the pump. Acuff was sitting in the car and Daugherty standing by the side of it. The street was well lighted and they could have been easily seen by anyone in the vicinity. The pump was within three feet of the back end of the car. Dr. Smith, for appellants, testified that the services of Daugherty's wife and father were reasonably worth from six to eight dollars per day. P. W. Cramer testified, by deposition, that he passed the filling station, was stopped by Johnson and saw Daugherty and Acuff with the pump hose across the back of Acuff's car with the nozzle in the tank of the car. The day of the shooting, or shortly afterwards, the Chief of Police and Mr. Medlin had taken a statement from Cramer purporting to tell all he knew of the occurrence and in which he did not mention seeing the hose inserted in the tank of Acuff's car.

Officer Nixon testified that he accompanied Johnson to the shanty, that Johnson called Daugherty out and told him he was going to arrest him, that Daugherty said he wasn't, whereupon Johnson called him a liar and hit Daugherty, that Daugherty made no effort, that Nixon saw, to resist arrest and that his left hand was in the air warding off the blow, but he couldn't see his right hand.

The award made an allowance for medical aid in the sum of $508, to Mrs. Daugherty and respondent's father for nursing the claimant from the end of the 90 day period to the date of the hearing at $6 per day, $681, and to Daugherty for permanent disability $16.92 for 300 weeks and thereafter the sum of $6.34 per week for life and also allowed an attorney's fee of 25 per cent. The Commission also filed with the award an "Additional Findings of Facts and Rulings of Law," as follows:

"We find from the evidence that the employee on March 23, 1943, sustained an accidental injury, which arose out of and in the course of his employment resulting in permanent total disability.

"We further find that employer and insurer have paid more than $750 for medical aid during the first 90 days after the accident, but that they are liable for all medical services rendered and for all medicines and dressings furnished by Dr. Frank T. Kerr since the expiration of said 90 day period, and that they are also liable for nursing services from the expiration of said 90 day period at the rate of $6 per day which we find to be a reasonable charge for such services, to date of hearing, amounting to $681.

"The employer and insurer are ordered and directed to furnish employee with such medical, surgical, hospital and nursing services as may be reasonably necessary to cure and relieve him from the effects of his injuries.

"We further find that Gene Frost, Emory Medlin and H. A. Gardner rendered employee necessary legal services in connection with this

claim, and that they are entitled to an attorneys' fee of 25 per cent of the first 300 weeks of compensation payable hereunder."

This award was affirmed by the circuit court. There is no objection by appellants to these amounts, except the allowance to Mrs. Daugherty, respondent's wife, but they contend that the evidence absolutely fails to show that Daugherty's injury "arose out of" and while he was "in the course of" his employment.

It was stipulated and agreed to at the hearing that on or about March 23, 1943, the City of Monett was a major employer, operating under the provisions of the Missouri Workmen's Compensation Law, by reason of said City having formerly elected to come under the act, and that their liability under said law was fully insured by the Western Casualty and Surety Company; that on March 23, Gladden Daugherty was an employee of the City of Monett and was working under the provisions of the Compensation Act; that the employer had due notice of the accident or alleged accident and that a claim for compensation was filed within the time prescribed by statute. It was further agreed that the average weekly wage of Daugherty was $25.38, that the city had voluntarily furnished medical assistance for the first 90 days amounting to more than $750 and that Daugherty was demanding a larger sum for medical assistance that had not been furnished.

Many cases are cited by both appellants and respondent and with the principles of law enunciated in these cases, we are in entire agreement. A review of these general principles is here appropriate.

(a) The findings of the Commission as to the facts has the force and effect of the verdict of a jury, is conclusive and will not be disturbed by an appellate court if there is competent and substantial evidence to support them. [Smith v. General Motors Corp. (Mo.), 189 S. W. (2d) 259; Wamhoff v. Wagner Elec. Corp. (Mo. App.), 187 S. W. (2d) 865; Staten v. Long-Turner Construction Co. (Mo. App), 185 S. W. (2d) 375; Tabor v. Midland Flour Milling Co. (Mo. App.), 168 S. W. (2d) 458.]

(b) In determining this question, this court will consider only the evidence most favorable to sustaining the award, and all reasonable inferences that may be drawn therefrom. [Wamhoff v. Wagner Electric Corp., *supra*; Hickman v. Metropolitan Life Ins. Co. (Mo.), 185 S. W. (2d) 840; Hickman v. Dunlop Tire & Rubber Co. (Mo. App.), 185 S. W. (2d) 874.]

(c) In compensation cases the weight of the evidence and credibility of the witnesses are for the Commission to determine. [Gleason v. Brashear Freight Lines (Mo. App.), 188 S. W. (2d) 72.]

(d) The word "accident" within the meaning of the Compensation Act means an unexpected or unforeseen event happening suddenly and violently, with or without human fault, and producing at the time objective symptoms of an injury. [Sec. 3695, Revised Stat-

utes of Mo. Anno. 1939; Staten v. Long-Turner Construction Co., *supra.*]

(e)  Compensation laws must be given a liberal construction in favor of the employee.  [Rue v. Pitcher Lead Co., 38 S. W. (2d) 487, 225 Mo. App. 400; Howes v. Stark Bros. Nurseries, 22 S. W. (2d) 839, 223 Mo. App. 793; Baldwin v. Gianladis (Mo. App.), 159 S. W. (2d) 706; Murphy v. Wells-Lamont Smith Corp. (Mo. App.), 155 S. W. (2d) 284; Rees v. DeBord Plumbing Co. (Mo. App.), 186 S. W. (2d) 488.]

(f)  The injury by accident must arise out of and in the course of his employment and must have occurred while he was engaged in or about the premises where his duties are being performed and where his services require such presence as a part of the services.  [Secs. 3691 and 3695, R. S. Mo. Anno. 1939.]

(g)  The injury does arise ''out of'' the employment when it is reasonably apparent upon consideration of all the facts and circumstances that a causal connection exists between the conditions under which the employee's work is required to be done and the resulting injury.  Tabor v. Midland Flour Milling Co., *supra*; Smith v. Levis Zukoski Merc. Co., 14 S. W. (2d) 470, 223 Mo. App. 743; Macalik v. Planters Realty Co. (Mo. App.), 144 S. W. (2d) 158; Staten v. Long-Turner, *supra*; Wamhoff v. Wagner Electric Corp. (Mo. App.), 187 S. W. (2d) 865; Metting v. Lehr Const. Co. (Mo. App.), 32 S. W. (2d) 121.]

There is little difficulty in ascertaining the rules of law.  The application of these rules to a particular state of facts gives the Commission and the courts more concern.  As was said by our Supreme Court in Leilich v. Chevrolet Motor Co., 328 Mo. 112, 40 S. W. (2d) 601, 1. c. 605:

''Since the adoption of workmen's compensation acts, in England and then in this country, there have been many definitions of the phrase 'arising out of  .  .  .  his employment' essayed by the courts. Some of these definitions, framed by eminent courts in view of the facts of the particular cases before them, have been repeated so often by other eminent courts that they have become formulae, to some one of which, it is thought, the facts of every case must conform in order for compensation to be allowable therein.  [Wahling v. Grocer Co. (Mo.), 29 S. W. (2d) 128; Cassidy v. Eternit (Mo.), 32 S. W. (2d) 75; Jackson v. Investment Co., *supra.*]  There is no justification for investing the words 'arising out of  .  .  .  his employment' with a technical meaning; they are plain, ordinary, and everyday words, and should therefore be given their plain, usual, and ordinary meaning.  Every case involving their application should be decided upon its own particular facts and circumstances and not by reference to some formula.''

First, do the facts here show that respondent was accidentally injured in the course of his employment? He was on duty as a policeman the night of the injury. His hours of service were from 8 p. m. to 5 a. m. He was injured about 3:30 a. m. within the hours of his employment. He was in the western part of the City, which had been assigned him as territory to patrol. The watchman's shanty was in that territory. Furthermore, it had long been an approved custom for police officers to visit the shanty to get information from the watchman relative to prowlers, suspicious characters and law violations. Even the Chief had followed this custom and his regular hours were in the daytime. The watchman had been instructed to cooperate with the officers and had been doing so. Johnson used this watchman to transmit information to Daugherty that very night knowing that in the course of his duties he would appear there. He went there to find him. Unquestionably the injury was received in the courses of his employment at a place about the premises where his duties were being performed and where his services required him to be in the performance thereof.

Second, did the injury arise "out of" his employment? What does the evidence show actuated Johnson in shooting his fellow-employee? Johnson had complained to their chief that Daugherty had been driving a police car as a taxi after disconnecting the speedometer. He had told the watchman to tell Daugherty to investigate the filling station pump as it was not locked. This was Daugherty's duty. He had appeared while Daugherty was making such investigation and accused him of not performing his duties and of taking gasoline from the pump. More than an hour later when he called Daugherty out of the shanty, he said he was not satisfied with the way Daugherty was running that end of town, referring to Daugherty's territory. None of these complaints could have been made if Daugherty had not been a policeman and most, if not all of them, referred to his actions as an officer in his particular territory. All of these matters led up to and culminated in the shooting. The injury would not have been sustained if Daugherty had not been a policeman and at a place where he was required to be within his hours of employment. If it did not arise out of his employment, from what source did it arise? The evidence shows no other. Bearing in mind the foregoing principles of law, we think under the facts in this case that the injury arose out of and in the course of his employment at a place where his services required him to be, and is compensable. [Pearce et l. v. Modern Sand & Gravel Co., 99 S. W. (2d) 850, 231 Mo. App. 823; Macalik v. Planters Realty Co., *supra*.]

Appellants contend that the Commission was in error in making an allowance for nursing by respondent's wife. They assert that nursing is a duty she owed her husband by virtue of the marital relation

and for which she could not collect from him and which, for that reason, could not be included in the award against appellants. As authority for this contention they cite the cases of Claas v. De Vere, 129 Neb. 812, 235 N. W. 450, and City of Milwaukee v. Mueller, 144 N. W. 188, 154 Wis. 652. An examination of the Workman's Compensation Statutes of Nebraska and Wisconsin relative to such allowances reveals that they are not the same or as specific as ours. Our statute (Sec. 3701, R. S. Mo. 1939) requires the employer to furnish "such medical, surgical, and hospital treatment, including nursing," as may be reasonably required for the first 90 days, and "such additional similar treatment as the Commission by special order may determine to be necessary." It also provides that such fees and charges shall be fair and reasonable and subject to regulation by the Commission, and states, "The Commission shall also have jurisdiction to hear and determine all disputes as to such charges." There is no dispute in the testimony here but what the wife rendered excellent service and it was certainly in addition to her ordinary household duties. The statute does not require the employment of a trained graduate nurse. It merely holds the employer liable for "nursing." Webster defines nursing, "To take care of or tend, as a sick person or an invalid; to attend upon. To care or provide for tenderly or sedulously."

All this was done by the wife of respondent. The two cases above cited infer that a husband, being entitled to the services of his wife, can not be sued and compelled to pay for them and that consequently appellants could not be required to pay for them. They were not the ordinary household services of a wife but extraordinarily services in addition to her ordinary duties.

Our statute is entirely different to the statutes in Nebraska and Wisconsin, and specifically mentions "nursing" as one of the services for which the employer must pay. We believe that a liberal construction of the statute would justify requiring the employer to pay for competent nursing, although it was rendered by the wife of the respondent, and that under the Missouri Workman's Compensation Law, the Commission and the Circuit Court were justified in holding appellants liable for this nursing service. The judgment of the trial court is therefore affirmed. *Fulbright, P. J.,* and *Blair, J.,* concur.