QUENTIN KATEMAN, EMPLOYEE, RESPONDENT, v. ROYCE ZING, EMPLOYER, ET AL., APPELLANT.—180 S. W. (2d) 253.

Kansas City Court of Appeals. May 8, 1944.

254

*George A. Hodgman* for appellants.

*Edward C. Lynch* for respondent.

CAVE, J.—This is an appeal from a judgment of the circuit court of Cooper County which affirmed an award by the Workmen's Compensation Commission in favor of plaintiff (respondent) and against defendants (appellants).

The award was for a *permanent total disability* allowance of 300 weeks at $8 per week, and for $6 per week for life after the expiration of the 300 weeks' period, "subject to modification and review as provided by law." It is conceded the present value of the life payments, plus an unpaid balance of $104.49, is $4,105.89. This calculation is computed under the formula approved by the Supreme Court in Burgstrand v. Crowe Coal Company, 333 Mo. 43, 62 S. W. (2d) 406. Therefore our jurisdiction.

Appellants urge that the court erred as a matter of law in affirming the award of the commission for a *permanent total disability* allowance, "because there was not sufficient competent evidence in the record to warrant the making of the award." This necessitates a rather full recitation of the facts.

Respondent accepts as essentially correct the history and facts of the case as made by appellants in their brief. The record discloses that on May 5, 1935, respondent, then twenty-six years of age, was the driver of a truck used by appellant Zink, a subcontractor on a certain

258

highway construction job, and was seriously injured in a collision between his truck and another.

The case has been heard and awards made on three occasions by the Commission. The first hearing was held August 14, 1935, while Kateman, was still in the hospital being treated for his injuries. At this hearing the attending physician, Dr. van Ravenswaay, testified concerning his injuries. The commission made an award granting compensation to and including February 14, 1936, unless the disability should end at an earlier date. Recovery of Kateman was extremely slow, he was in the hospital for about sixteen months. Disability being apparent, the insurer proceeded to make payments long beyond the date provided for in the first award, for it was obvious that the employee would have some residual impairment of both of his legs and become entitled to more compensation than would be paid by February 14, 1936.

There was a second hearing before a Referee of the Commission at Boonville on December 11, 1940. Up to that time the insurer (appellant) had paid 287 weeks of compensation at $8 per week, in addition to all necessary medical, surgical and hospital treatment. Following this hearing, the Commission made its second award under date of February 7, 1941, the pertinent part of which is:

"We find from all the evidence that employee herein sustained certain injuries on May 5, 1935, which arose out of and in the course of his employment, and is entitled to compensation for temporary total disability in the sum of $8.00 per week from said date to and including December 27, 1939 (*date employee began working and earning wages in excess of the compensation payments*). Employer and insurer have paid compensation beyond December 27, 1939, and are entitled to credit for same. *Compensation payments shall not begin again until such time as employee is not working and earning a weekly wage as is true under the present facts.*" (Italics ours.)

The third and final hearing was held before Commissioner Nelson on March 31, 1942. The final award of the Commission was made under date of May 8, 1942, the material part of which is:

"We find from all the evidence that employee herein sustained an accidental injury on May 5, 1935, . . . and he is entitled to compensation for permanent and total disability as herein provided.

. . .

"For permanent total disability the sum of $8.00 per week for 300 weeks and thereafter at the rate of $6.00 per week for life, said payments to begin as of May 6, 1935, and to be payable and be subject to modification and review as provided in said law."

The award also allowed an attorney's fee of $35 for services rendered at the hearing on March 31, 1942; and gave credit to the insurer for $2295.51, as the aggregate net payments of compensation to that date, leaving a balance due of $104.49, under the 300-week portion

of the award. In addition to the compensation paid the employee, there was the sum of $5293.02 for medical, surgical and hospital expense.

At the first hearing Dr. van Ravenswaay described Kateman's injuries as a fracture of the left femur and three fractures of the pelvis, none of them compound; an injury to the bladder, a fracture of the left humerus and lacerations of the scalp and body. That during confinement in the hospital Kateman developed an infection in the left knee and later an infection of the right or unfractured leg. The fractures were well healed but the doctor thought the knees would be stiff. Th radial nerve in the left arm "was cut, . . . he can't use his hand very well; . . . he has a dropped wrist." At the time of that hearing the doctor stated that he did not know exactly what percentage of permanent disability would result; that he thought Kateman could not return to work as a truck driver; and that in an open labor market "he would have a hard time to compete with anybody else."

At the second hearing, which was held five years and four months later, Kateman and Dr. van Ravenswaay were the only witnesses. At that time Kateman testified that both his knees were stiff; his left arm was all right except he could not fully close his hand, which condition was showing some recent improvement. There was a draining sinus in one leg; and one ankle was somewhat impaired, the other was all right. The broken pelvic bone seemed all right, and he could use his hips. There was no particular pain except in his legs once in a while. That his disability at that time was in the left hand and from the knees down. He stated that on December 28, 1939, about a year before the second hearing, he had started to work for Dr. van Ravenswaay as a janitor in the doctor's eighteen-room hospital in Boonville at $7 per week and was still so employed at $14 per week. He got up or down stairs by holding to a bannister or by using an elevator; that he did such work as cleaning the hospital rooms, electrical repair jobs, moved hospital equipment and was generally handy man about the place. He drove the doctor's car to take patients to and from the hospital. He did not use crutches or a brace at that time. "I use a cane where I have to be on my feet all day long, but I don't use crutches only when my leg swells up or something like that." He complained of some eye trouble, but this was not due to the accident. One sinus in the leg had opened about a month previous; the other had been closed about a year and a half. To drive an automobile on short trips did not bother him, but he would get pretty tired if he had a long ways to go. He wanted to get on some public works job as a timekeeper but failed because they would not hire him "because of his knees, and because a company won't insure me." He could not lift much and thought he could not work loading or unloading trucks. He walks more slowly than normal.

Dr. van Ravenswaay, in describing the injuries at the second hearing, mentioned a fractured left wrist, which was not mentioned at the first hearing; that the eye trouble complained of was due to shortsightedness. Spots of infection had appeared in the legs from time to time since the first hearing, but he thought they would finally close up. Both knees were stiff. The flexion of the left hand enabled the respondent to bring his fingers within a half inch of the palm and he thought that condition would improve. The fractures of the pelvis were healed and there was no limitation of either leg at the hips, and such fractures were not disabling. The fractures in the left arm and wrist were properly united. The doctor first gave Kateman employment in the hospital partly through sympathy for him, but after he was there for a short time he found Kateman was performing his duties in an excellent manner and at the time of the second hearing he considered him the best of the three janitors employed at the hospital. He testified that Kateman had strong arms and torso, but "his legs won't allow him to do the work he will be asked to do. . . . He couldn't do common labor; he would have to have a picked job." His general health is fairly good.

The doctor was asked whether, limiting his opinion to the physical condition of Kateman, he could estimate the percentage of impairment suffered as a collective result of all injuries to respondent of a permanent nature as rated against a theoretical 100 per cent man, he said, "I would judge his permanent disability to be 50%."

It was following this hearing that the Commission ruled that compensation payments should not begin until such time as the employee was not working and earning a weekly wage, which order is set out *supra*. The case was held open for a further hearing and final award.

At the third hearing on March 31, 1942, Dr. van Ravenswaay and respondent were the only witnesses. The doctor had been treating Kateman from time of injury and made his last examination on March 23, 1942. He found the left leg one-half inch shorter than the right; scars on both knees and a discharging sinus on the right knee, the discharging from the left knee had healed. There was a small bone cavity in left tibia. The injury to the left radial nerve had left the hand "slightly smaller and somewhat behind the other hand in development;" that a complete fist could not be made but the left hand could be used in grasping objects, lifting and pulling. Both knees are completely stiff, but there is free motion at each hip. The doctor's conclusion was that there would be no substantial improvement in the motion of the knees; "such condition was permanent." The trouble in the knees, which caused the discharge, is osteomyelitis, which has a tendency to heal up and break out again. He thought respondent would not be bothered very much more on that score, but the knees might break open, although he thought there would be no more bone involvement because of better available treatment such as the sulfa

compound. The cavity in the left tibia does not make the bone any weaker; in fact, "the bones are thicker than they used to be." . There had been a complete recovery from the injuries to the pelvis and back.

Commissioner Nelson asked the doctor if he would pass Kateman for any kind of manual labor if examining him, and the doctor replied: "If he could sit down, I believe he could do it. He is very strong in his arms. He is very strong in his torso. I do not believe he would be able to stand eight hours a day." He gave as his opinion that Kateman had a fifty per cent permanent disability as a man without respect to any particular member of his body.

Respondent testified that the condition of his knees had not improved since the last hearing. "I think I have just about gone my limit as far as walking is concerned or anything else. . . . My legs hurt me; when I stand on them too long they swell. . . . If I am on them eight hours, my feet and knees begin to swell. . . . No pain in my back. . . . Worst trouble in my knees. . . . I can't bend either of them. . . . There is a scar just below the right knee, which runs if I am on my feet all day; if I sit around all day it doesn't do that; my left knee is healed up at the present time; I have trouble with that once or twice every two months; it swells up on me; I have to use some kind of medicine to draw those places open before I can get relief."

Concerning his employment, respondent stated that he had worked for Dr. van Ravenswaay at the hospital for about two years prior to October, 1941. That he started at $7 per week and when he voluntarily quit was receiving $14 per week. After leaving the work at the hospital he was employed at a funeral home for two weeks at $12 per week but that work was too heavy. He was then out of employment for about three weeks and went to work for the Jenry Taxi where his earnings were about $9.50 per week. He drove the taxi from sixteen to eighteen hours per day. About January 22, 1942, he quit that job because he could not earn enough, and after about a week's layoff he secured employment at the Dixcel Filling Station, earning $60 per month. His duties were to fill cars with gasoline, oil and water and do grease jobs; other employees filled tires, etc. He continued at this work until two or three days before this final hearing, when he voluntarily quit to go to Ft. Leonard Wood to take an examination as an automobile mechanic. He could do the work at the filling station; "I could handle it all right, but, you know, it doesn't pay enough for a man to come out."

Kateman had graduated from high school but had always been engaged in common labor, in recent years principally as a truck driver.

At the conclusion of taking testimony it was agreed that Kateman be sent to Dr. Ralph Mueller of Kansas City for a complete examination and report, and that said report should be made a part of the record without benefit of cross-examination of either party. On April

18, 1942, Dr. Mueller made his examination and filed his report with the commission. Summarized, his findings and conclusions are:

"A fracture through the intertrochanteric region of the left femur which has healed with some deformity and shortening of the left leg and some limitation of motion in the left hip joint.

"A fracture of the left humerus which has healed solidly with some deformity and with some limitation of motion both in the elbow joint and in the metacarpal phalangeal joints of the left hand.

"A double fracture of the pelvis on the right side which has healed with some deformity but with no particular signs of disability.

"A fracture of the transverse process of the fourth lumbar vertebra on the right side.

"A ligamentous injury involving the bony attachments of the ligaments of the posterior aspect of the right ilium encroaching upon the superior portion of the right sacro-iliac joint.

"A fracture through the right transverse process on the fifth lumbar vertebra with some encroachment on the superior aspect of the left sacro-iliac joint.

"A fracture dislocation of the cocyz.

"An osteomyelitis involving both knee joints with complete bony ankylosis. On the right knee joint there is present a sequestrium of piece of dead bone which, in all probability, will require surgical intervention for relief. If is also quite possible that the osteomyelitis in both lower extremities may light up at any time and cause additional trouble in the future.

"From the results of this examination and a study of the various x-ray plates, this examiner is of the opinion that this claimant presents at the present time a permanent and total disability for the performance of any form of manual labor *requiring standing or walking.*

Of course, with the presence of an ankylosis or permanent stiffness of both knee joints, it will be impossible for him to do any form of work requiring *work on ladders or going up or down stairs.* (Italics ours.)

"In summing up this patient's various injuries, together with the fact that an osteomyelitis either in one or the other or both lower extremities may be activated at some future date by even a slight injury, this examiner feels that this claimant should not be rated at very much less than a permanent total disability."

Dr. Mueller submitted the various x-ray plates taken in his office to Dr. Ira B. Lockwood of Kansas City for interpretation. His findings are summarized as follows:

"The findings in this case are those of completely ankylosed knee joints on each side, evidence of an old fracture of the left humerus; and old fracture of the left femur and fractures of both the body of the pubic bones on the right as well as a fracture at the junction of the isium and the ilium. Changes along the sacro-iliac articulation more

particularly on the right, suggesting evidence of old injury with overgrowth of bone in the healing process.''

Appellants questioned the admissibility and competency of the report of Dr. Mueller. Other than that question of evidence, they state that ''the only point at issue is whether or not there should have been an award for permanent total disability under Section 3706 (a), Revised Statutes of Missouri, 1939, or whether the award should have been made under Section 3705, which is the permanent partial disability provision of the Compensation Act in view of the express definition of the term 'total disability' imposed by Section 3695 (e).''

Appellants concede, as they must, that we cannot overturn the award of the commission in favor of respondent if there was substantial competent evidence to support it. [Sec. 3732, R. S. 1939.] The decisions are so numerous that we need only cite 29 West's Missouri Digest, pocket part, Workmen's Compensation, key 1939. So the question confronting us is, does the record disclose substantial evidence, when considered in most favorable light to respondent, to support the finding of *permanent total disability*?

Section 3706 (b) provides, ''When caused by the accident the loss of both eyes or the sight thereof, the loss of both hands or the use thereof, an injury resulting in practically total and permanent paralysis or an injury resulting in incurable imbecility or insanity, shall be conclusively presumed to be permanent total disabilities, *and in all other cases permanent total disability shall be determined in accordance with the facts.''* (Italics ours.)

Section 3965 (e) defines ''total disability'' as follows: ''The term 'total disability' as used in this chapter shall mean inability to return to any employment and not merely mean inability to return to the employment in which the employee was engaged at the time of the accident.''

Our courts have construed the term ''inability to return to any employment'' in this manner: ''. . . those words should be taken in their plain or ordinary and usual sense; that when we speak of the 'ability' or 'inability' of a person to obtain and hold employment, we ordinarily have in mind that the person referred to is either able or unable to perform the usual duties of whatever employment may be under consideration, in the manner that such duties are customarily performed by the average person engaged in such employment. . . . The word 'employment', not being a technical word, must be taken as having been used by the Legislature in its ordinary sense as meaning the relation of an employee to an employer in the usual and customary manner; that is to say, a regular hiring of an employee able to work and earn wages in the same manner as other employees.'' [Caldwell v. Melbourne Hotel Co., 116 S. W. (2d) 232, 238, 239; Kinyon v. Kinyon, 71 S. W. (2d) 78, 82; see, also, Maddux v. Kansas City Public Service Co., 111 S. W. (2d) 208.] It is not possible or

wise to give a straight-jacket definition of such language to be applied unrelentingly in every case. The above definition is sound but its application to a particular set of facts presents the difficulty.

Appellants cite many cases announcing the general rule that where there is no ambiguity in a statute, the words and phrases must be taken in their plain, ordinary and usual sense and the court has no right to interpolate or inject elements which are not specified; and that statutes must be harmonized if possible. We recognize such general principles and will follow them.

It is conceded respondent received *permanent injuries*. But that is only part of the answer to the question at issue. We must also be able to say that there is substantial evidence from which the commission could find he is *totally disabled and unable to return to any employment* as required by the statutes.

Our Compensation Act provides for several kinds of allowances for various injuries and periods of disability. Section 3703 fixes the limit for *temporary total disability* at 400 weeks. Section 3704 fixes the limit for *temporary partial disability* at 100 weeks. Section 3705 relates to *permanent partial disability* and fixes various time limits on forty-six specified injuries; such as "loss of one leg at the hip joint or so near thereto as to preclude the use of an artificial limb, 207 weeks." After fixing the maximum time limit of payment for such forty-six specified injuries, the statute then provides "for permanent injuries other than those above specified, compensation shall be paid for such periods as are proportionate to the relation which the other injury bears to the injuries above specified, but no such period shall exceed 400 weeks. Such other injuries shall include permanent injuries causing a loss of earning power." The quoted part of the section unquestionably provides for *compensation for unspecified injuries* which result in *permanent partial disability* and limits the time of payment to 400 weeks.

Section 3706 provides for *permanent total disability* and after enumerating certain specific injuries which shall be "conclusively presumed to be permanent total disabilities" (which are not applicable in this case), it then provides that "all other cases . . . shall be determined in accordance with the facts."

These sections provide a plan and scheme of compensation for all injuries and place the maximum limit on the time and amount of such compensation. It is evident *permanent total disability* relates to extreme cases, and each case must be decided on its facts unless it is one conclusively presumed to be permanent and total as enumerated in Section 3706. Therefore, can we say there is substantial evidence to support the findings of the commission in view of the fact that respondent's own evidence shows he had been gainfully employed for more than two years prior to the final award and for most of that time had been earning as much or more than he was before his injury? We think not.

It is worthy of note that at the second hearing the evidence developed the fact that respondent was working and earning $14 per week and the commission ordered that compensation payments. should not begin again until such time as the employee (respondent) "is not working and earning a weekly wage as shown by the evidence at this hearing." This would indicate the commission did not consider him *totally disabled*. At the third and final hearing the evidence did not disclose any change for the the worse in his condition. If anything it had improved slightly.

Respondent cites and relies on such cases as Kinyon v. Kinyon, *supra*; Maddux v. Kansas City Public Service Company, *supra*; Schroeder v. Western Union Telegraph Company, 129 S. W. (2d) 917. An examination of the facts in those cases will distinguish them from the situation confronting us. He also cites many cases announcing the general doctrine that the finding of the commission is conclusive if supported by any competent evidence; that the finding of the nature, extent and duration of the disability is a finding of fact, and has the effect of a jury verdict. We have no quarrel with those general principles, but it is uniformly held that there must be substantial evidence in the record to support the finding of the commission and if there is not, the then award of the commission cannot stand.

In the case of Valentine v. General Paper Stock Company et al., 37 S. W. (2d) 457, the St. Louis Court of Appeals had under consideration the question of whether there was substantial evidence to support the award of the commission for *temporary total disability*. The evidence disclosed that employee had been receiving $20 per week prior to his injury and that at the time of the final hearing he was employed in a different line of work and was receiving $17.28 per week. Because of this undisputed evidence the court held, under the very sections we have discussed above, that the commission was not authorized to make an allowance for *temporary total disability*. Such holding certainly lends support to our conclusion herein where the facts disclose that Kateman had secured three different positions in the open labor market and for a considerable time prior to the final hearing he was paid more per week than his average weekly wage at the time of his injury.

Workmen's Compensation laws of the various states are somewhat different in language and provisions but the general overall purposes are the same and decisions of other states are not always helpful, but those interested in this question are referred to 67 A. L. R. 786, and 71 C. J., p. 818, sec. 538, and cases there cited. The weight of authority supports our conclusion.

It is our opinion that there is no substantial evidence to support the finding that respondent is *totally disabled*. Whether he has suffered *permanent partial disability*, as defined in Section 3705 or is now

266

*totally disabled,* are questions for the Commission to determine and not for this court.

It follows that the judgment of the circuit court should be reversed and the cause remanded with directions to trial court to remand the cause to Compensation Commission for further proceedings in accordance herewith. It is so ordered. *Bland, J.,* concurs.