**Sidney GROCE (Claimant), Respondent,**

**v.**

**J. E. PYLE (Employer) and Massachusetts Bonding & Insurance Company (Insurer), Appellants.**

No. 22780.

Kansas City Court of Appeals.

Missouri.

June 2, 1958.

**484**

James K. Moran, Courtney S. Goodman, St. Louis, for appellants.

N. R. Fischer, Leo T. Schwartz, Kansas City, for respondent.

HUNTER, Judge.

This is an appeal in a workmen's compensation proceeding by appellants, J. E. Pyle, employer, and Massachusetts Bonding & Insurance Company, insurer, from the judgment of the Circuit Court of Saline County in favor of claimant, Sidney Groce, respondent, herein.

Respondent's claim for compensation stated in substance that while he was working on a high school project in Marshall, Missouri, and in the course of his employment he fell (from a partition) some nine feet to the concrete floor below causing him to sustain "back, spine, extremities and internal injuries" for which he asked compensation "as provided by law". The employer and insurer filed a general denial. However, at the hearing of the case before the referee they admitted that claimant had sustained an accident arising out of and in the course of his employment; that his average weekly wage was in excess of $52.50 and that the compensation rate was $35 per week. At the termination of the hearing the referee found claimant to have permanent *total* disability, and among other things, awarded claimant compensation in the sum of $35 per week for 300 weeks and thereafter $18 per week for the remainder of his life; found that claimant needed and would in the future need nursing, and awarded $40 per week, to be paid to claimant's wife, for nursing service as long as employee's invalid condition exists.

On reviewing the case, the Industrial Commission entered, generally, the same findings of fact and award. An appeal was taken to the circuit court, which after reducing the $18 per week portion of the allowance to $16 per week, entered its findings in accordance with those of the Industrial Commission and affirmed that award.

On this appeal appellant states the issues to be (1) whether there is proper pleading and substantial proof to support the award of the Industrial Commission for permanent and *total* disability (appellants concede that claimant has suffered substantial permanent *partial* disability), and (2) whether there is sufficient evidence to support an award for nursing services to claimant's wife.

█ Under the facts of this case this court has jurisdiction of the appeal. Mo. Const. Art. V, Sections 3, 13, V.A.M.S.; Scannell v. Fulton Iron Works Company, 365 Mo. 889, 289 S.W.2d 122, and cases cited therein.

We first consider appellant's contention that the award of the Industrial Commission finding that claimant was totally and

permanently disabled was not supported by competent and substantial evidence upon the whole record and was contrary to the overwhelming weight of the evidence.

■ On review of questions of fact decided by the Industrial Commission, our inquiry, as that of the circuit court, is limited to whether or not the findings of the Commission are supported by competent and substantial evidence upon the whole record. Const. Art. V, Sec. 22. As stated by our Supreme Court, en Banc, in Kansas City v. Rooney, 363 Mo. 902, 254 S.W.2d 626, loc. cit. 628: "This 'does not mean that the reviewing court may substitute its own judgment on the evidence for that of the administrative tribunal. But it does authorize it to decide whether such tribunal could have reasonably made its findings, and reached its result, upon consideration of all of the evidence before it; and to set aside decisions clearly contrary to the overwhelming weight of the evidence.' " With these established principles in mind, we proceed to examine the evidence before the Commission.

Claimant testified he was 64 years old, has approximately an eighth grade education, and all of his life prior to the instant injury performed heavy manual labor. He has followed the trade of carpenter since 1911, except for one year when he farmed. At the time of the accident on July 15, 1955, he was standing on a partition 9 or 10 feet above the concrete floor of the high school building. A stud to which he was holding came loose causing him to fall. He lit on his feet and fell sideways. His heels were broken and he occasioned other injury. Dr. Ralph Jones, a physician, was called. Dr. Jones examined his feet and had him taken to his office. There Dr. Jones X-rayed his feet and ordered him to be immediately transported to the hospital where he was confined until about October 6, 1955.

Claimant testified that following his fall he experienced severe pain in his heels, legs, back, arm, neck, right shoulder, and "practically all over". His right heel was operated on and placed in a cast. Commencing sometime during the first period of his hospitalization he experienced shortness of breath and pains in his chest. (According to the hospital records complaint of this was made on the night of August 10, 1956.) Prior to the accident he had had no shortness of breath and no pain in his heart or left side. Although he reported the chest pains to the nurse and to Dr. Jones he received no treatment for them. Dr. Jones would say, "Yes, I know" and leave him. Within the first two weeks that he was in the hospital he began developing blackouts during which time he would become numb and be unable to see or to control himself and had to have help. He reported these blackouts to Dr. Jones. They occurred sometimes about once a week and sometimes two or three would be close together—the same day or within two days.

When he was discharged from the hospital he was directed to use a wheel chair, and was unable to walk. Dr. Jones visited him at his home and endeavored to get him to walk but claimant was unable to do so. Dr. Jones told him he had no heart trouble. Since Dr. Jones did not endeavor to treat his chest pains and shortness of breath claimant consulted Dr. R. C. Haynes, in Marshall, Missouri, relative to his heart condition. He told Dr. Jones of this and Dr. Jones told him he could not have another doctor. Nonetheless, he continued with Dr. Haynes.

At the time of his first hearing before the referee, which claimant attended in a wheel chair, he stated that his neck, back, and legs since the accident were no better. He was never free from pain. His right shoulder is numb and hurts. He can raise his right arm but it causes pain. With the use of a cane he can walk only about 20 feet without stopping to rest. Even that short distance causes him to "give out * * * all down through (his) body— heels get hot—just feel like they're burning." He has not performed, and has been

unable to perform, any work of any kind or character since the accident and is "not able to do anything". His wife quit her job where she was earning $40 a week to take care of him and provide nursing for him. He has driven a car both with the cast on his foot and after its removal. He would be helped into and out of the car. His driving included going from Fayette to Marshall to see Dr. Haynes and back home. He still drives though he recognizes the danger of a blackout. On three occasions he walked up the steps to Dr. Jones' office. This climb took a good half-hour or more and caused pain.

At the second hearing on November 8, 1956, claimant testified that so far as being able to get around, walk or move his legs, his condition is worse than it was at the first hearing. His legs are weaker. He is unsteady on his feet. His legs are numb, cause him pain and make him sick. His chest condition and pain are no better. The pain is more frequent. He has blackouts oftener. Because of his condition, he has to have constant help, and it is necessary for his wife to wait on him and care for him more than ever. She is with him constantly.

Claimant's wife testified that she quit her dollar an hour, 40-hour week poultry house job "because her health wasn't too well, and claimant's condition was such that she was afraid to leave him by himself." She is with him constantly and has observed his blackouts. They are getting more frequent and she is almost afraid to go to sleep at night. As often as two or three times a week she has to get up at night to tend him. They are financially unable to employ a nurse, and she acts as his nurse. When he has a blackout he would fall over if he were sitting up. She has to give him a kind of artificial respiration; rub his arms and the back of his neck, and bathe his face with cold cloths. He doesn't get around as well now as at the time of the July 5, 1956, hearing, and the pain seems worse.

Dr. Jones testified by deposition that he examined claimant at the scene of the accident, at his office, and at the hospital. Claimant's heels were X-rayed and found to be fractured. Surgery was performed on claimant's feet by placing pins in them. During his stay at the hospital claimant also complained of his right arm and shoulder but did not complain of his back and he made no examination of the back until December 24, 1955, when at his office claimant first complained of it. His complaint of shoulder pain was made about one month after claimant was in the hospital and witness could find no organic basis for the complaint. Claimant had no disuse of his right arm, and there was no visible evidence there was any weakness in it. He acknowledged claimant had a shoulder separation but could not say what caused it. He testified that when claimant on December 24, came in complaining of low back pain radiating into both legs he had examined and X-rayed his back but could find nothing wrong with it. The only evidence of injury was to claimant's feet. When he saw claimant again the following March or April, claimant then had marked limitation of motion and marked soreness in the lower portion of his back and even had numbness to pin pricking. He was unable to explain what caused this change in plaintiff's condition.

With reference to claimant's heart, Dr. Jones testified that while claimant was in the hospital he had listened to it with a stethoscope and could hear no abnormality, and from a gross examination he found no enlargement or anything else wrong with claimant's heart. He did not obtain an electrocardiogram or examine other than by listening. He stated claimant had no complaints of the heart until after claimant saw another doctor. He felt claimant was getting to the place where he should have been able to be on his feet more than he was, and that claimant was, at least to some extent, malingering and overstressing his injury in order to obtain a better and

lump sum settlement of his claim; that his relations with claimant were so poor he was no longer treating him. He last saw claimant in April and never had told claimant he was ready to go back to work.

Dr. Frank Feierabend's report of May 28, 1956, covering an examination of claimant made by him on May 22, 1956, in consultation with Dr. Harold Zuber was received in evidence by agreement of counsel in lieu of him personally appearing and testifying. Dr. Feierabend listed claimant's then present complaints as (1) pain and stiffness of both feet aggravated by use, (2) shortness of breath on walking a very short distance, (3) numbness of the entire right upper extremity up to his spine, (4) pain and numbness of both hips and the low back. On his examination of claimant Dr. Feierabend found "the heart is enlarged downward and to the left". Additional findings that he made were: "The patient has extreme difficulty in standing, and has muscle spasms in the lumbar area. He has a forward list and wants to use his hands to help support his weight. Motions of the spine are limited in all directions. In the right foot there is considerable deformity of the os calcis with protrusion of bone just distal to the external malleolus which is characteristic of os calcis fracture. Inversion and eversion are limited approximately fifty percent. In the left foot but to a lesser degree the same condition obtained. Both feet are tender to pressure especially at the level of the subtalar joints. Claimant's neck has a limitation of motion to the right of 20%. Traction on the head does not produce any relief of his discomfort but aggravates it. There is considerable tenderness over the muscles on the right side of the neck and over the scalenus onticus on the right side. Claimant's liver and spleen are large and tender. The abdomen is distended and there is an impression of fluid in the lower part of the abdomen." X-rays of claimant provided by Dr. I. H. Lockwood show a definite increase in the space between the acromion process and the head of the humerus fully ⅓ wider than that of the left shoulder region. They also show as to both the right and left os calcis a marked comminution and fracture of the right os calcis with definite and marked deformity.

Dr. Feierabend concluded: (1) Claimant has difficulty with his heart and "should be examined by a cardiologist to determine whether or not there is any connection between his present cardiac condition and trauma. * * * I doubt if this is due to trauma." He has suffered a whip lash injury to his neck and has a cervical radiculitis incidental thereto. There is an injury to the spine in the dorsal as well as in the lumbar area. There were fractures of the os calcis bilaterally "and he has extreme disability incident to this condition. He has a very high degree of disability in the lower extremities, at least sixty to seventy percent in the right foot and approximately fifty percent in the left foot. * * * It is my opinion this man will never do manual labor again. * * * without taking into consideration anything relative to the heart * . * * the permanency in this man is very high, probably in the neighborhood of seventy to seventy-five percent with the rating made on the body as a whole."

Dr. Lockwood's report was received in evidence by agreement. It interpreted X-rays of both shoulders, spine, pelvic and os calcis. While not as detailed or comprehensive as Dr. Feierabend's report, as to those portions of the body, it discussed, it supported that report. Also in evidence was a report dated February 15, 1956, from Graham Asher, an outstanding heart specialist. This highly technical report concerning plaintiff's heart condition was requested of Dr. Asher by Dr. R. C. Haynes to assist Dr. Haynes in his diagnosis and treatment of claimant's heart condition.

Dr. Haynes, a general practitioner for thirty-four years, with in active practice

including internal medicine and surgery, does electrocardiograph work. It is his practice to send the electrocardiograph reports to Dr. Asher. On February 13, 1956, he examined claimant, and thereafter continued to examine and treat him for his heart condition. Because he knew of Dr. Jones' interest, he did not undertake anything of an orthopedic nature. Claimant came to see him because of a blackout claimant had just had, and because of his shortness of breath, extreme exhaustion and pain in his chest. Dr. Haynes found claimant cold, clammy and short of breath. Dr. Haynes made a heart examination, gave him medication for his heart and advised his wife "he was in serious condition as far as his heart muscles were concerned." According to his findings, claimant's heart was irregular and the musculature of the heart was very flabby, and there was a lot of pain from the heart region. "He was very sick". Thereafter, Dr. Haynes saw claimant twelve additional times and made an electrocardiogram which he read and which showed claimant did have an abnormal heart condition. He interpreted Dr. Asher's report as saying claimant had "a generalized condition of his coronary arteries that caused an insufficiency of the blood supply to the heart. In other words, a coronary condition, and that he had a poor heart muscle response which was due probably to lowered metabolism, deficiency of minerals and vitamins and, in other words, a flabby heart, as I stated before * * *." A second electrocardiogram taken about May 4th, disclosed some improvement but still showed the coronary insufficiency and confirmed the heart disability disclosed in the earlier tracing. Dr. Haynes was asked whether or not in his opinion "this man was able to engage in any manual labor, or any occupation requiring any physical strain or force at all. He answered, 'I would definitely say that he was totally incapacitated from the standpoint of his heart condition. Q. * * * I take it, that your answer is, that from the heart alone, he was totally disabled? A. That's right.' That the prognosis was extremely guarded.

"Q. Will this man, in your opinion, ever be able to engage in manual work —work and labor of any kind, involving stooping, lifting, climbing—or work or labor of any kind or character, involving the use of force or strength— I don't mean work where you sit at a desk and look out a window—what I mean is, common labor, of any kind— do you think he ever could for the rest of his life? A. He shouldn't ever do it on account of his heart. I don't think he could do it. * * *

"Q. You think the results might be fatal if he tried? A. Definitely.

"Q. And as a physician, and his physician, you wouldn't recommend that he do *anything*? A. That is correct.

"Q. In other words—he's through? A. That is right.

"Q. * * * is he physically able to look after himself? A. I'd say he wasn't physically able to look after himself and that someone would have to be around to wait on him.

"Q. From the heart condition I take it, there is no cure for him, is there? A. No. * * * He should be under constant medical treatment and care.

"Q. And if he is not given this treatment that you recommend, I assume, the end result will be a fatality? A. Yes, sir.

"Q. All right. *So to sum up your testimony, the man is totally disabled,* will never be able to work again, but should have constant treatment for the heart condition? A. That is right."

In connection with a hypothetical question he was asked,

"What I'm trying to find out Doctor is, is there any connection between his

heart condition and what happened to the man from the accident? A. My diagnosis is—that this condition of his heart was brought on following the accident by his inability to work, and worrying about it and the fact that he was incapacitated over this long period of time from this accident. I think that answers it.

"Q. Yes, sir. In other words there is a direct connection between the accident and the heart condition? A. It was brought on by the fact that he was unable to work following the accident, that's right.

"Q. I see. A. It became flabby and he was unable to work and his heart became weakened and he worried about it.

"Q. And does emotional strain and stress in your opinion, have any effect upon the heart? A. It tends to bring on a heart attack."

On cross-examination he stated: "* * * he was disabled, and when you take a man out of his active labor and put him in a wheel chair or bed for that many months, his heart undergoes changes, and plus the worry. * * * (This) was enough to cause him to have the heart condition that he has."

We return to appellants' assignment that there is not sufficient evidence in the record to support the Industrial Commission's finding that claimant was totally and permanently disabled. Their precise contention is that such finding necessarily requires a proper showing that claimant's heart condition resulted from the accident, and that there was no competent and substantial testimony before the commission to support a finding of the requisite causal relationship between the accident and the heart condition.

In support of their contention appellants say that Dr. Feierabend, whose report was offered in evidence by claimant,

was of the opinion that the trauma had no relation to claimant's heart condition. They concede that Dr. Haynes, on claimant's behalf, testified that there was a causal relationship between the two. Appellants conclude that in view of this conflicting testimony, the heart condition could be due to either one of two causes, and that it is not sufficient for recovery to show that the heart condition resulted from one or the other of two causes, for one of which but not the other, the appellants would be liable.

■ The rule is that the burden of proof rests on the claimant in a workmen's compensation proceeding, and it is not sufficient for recovery to show only that the injury complained of resulted either from one or the other of two causes, for one of which, but not the other, the employer would be liable. The claimant must produce evidence from which it reasonably may be found that such injury resulted from the cause for which the employer would be liable. Seabaugh's Dependents v. Garver Lumber Mfg. Co., en Banc, 355 Mo. 1153, 200 S.W.2d 55. See, also, Hubert v. Department of Labor and Industries, 39 Wash.2d 531, 236 P.2d 1042, 1043; Warlick v. Driscoll, 68 Idaho 552, 200 P.2d 1014; Morris v. Wags Transportation Company, 3 A.D.2d 872, 161 N.Y.S.2d 387; Annotation, Sufficiency of Expert Evidence as to Cause, 135 A.L.R. 516.

■■ An unbiased reading of Dr. Feierabend's report reveals that he acknowledged he was not an expert in the heart field, and that claimant should be examined by one qualified in that field to determine if the questioned causal relationship existed. He in effect emphasized his feeling of lack of competency in the heart field to express a valid opinion by rating claimant's disability absent any consideration of his heart problem. Under such circumstances, his off-hand expression of doubt of causal relationship obviously carried little, if any, probative

value in his own mind, and it is the function of the Commission to evaluate this testimony along with the other testimony before it. Claimant produced other evidence, competent and substantial, to the effect that claimant's heart condition did result from the accident. The resultant question of causal relationship was one of fact peculiarly for the determination of the Industrial Commission. Cf. Vollmar v. Board of Jewish Education, Mo. Sup., 287 S.W.2d 868, 872; Garrison v. Campbell "66" Express, Inc., Mo.App., 297 S.W.2d 22, 30; Brown v. Griesedieck Western Brewing Co., Mo.App., 250 S. W.2d 803, 809.

■ Appellants suggest there is no evidence to support a finding that claimant could not perform any work regardless of its nature. Section 287.020, subd. 7 RSMo 1949, V.A.M.S., provides, "The term 'total disability' * * * shall mean inability to return to any employment and not merely mean inability to return to the employment in which the employee was engaged at the time of the accident." Our courts have ruled that the words in the statute should be understood in their plain or ordinary and usual sense and that when we speak of inability of a person to return to any employment the meaning ordinarily is that the person referred to is unable to perform the usual duties of the employment under consideration, in the manner that such duties are customarily performed by the average person engaged in such employment. Kinyon v. Kinyon, 230 Mo.App. 623, 71 S.W.2d 78; Kateman v. Zink, 238 Mo.App. 253, 180 S.W.2d 253; Maddux v. Kansas City Public Service Co., Mo.App., 111 S.W.2d 208. Further, the terms "any employment" mean any reasonable or normal employment or occupation as those words are generally understood, and it is not necessary that the injured employee be or remain completely inactive and inert in order to meet the statutory definition of one unable to return to any employment. As said in Maddux v. Kansas City Public Service Co., supra, loc. cit. 214: "Claimant might be able to sit on the street and sell peanuts, pencils or shoe strings. There is ample evidence from which the commission could have found that he could not carry on any normal dignified occupation." The question is could any employer of labor, in the usual and ordinary course of business, seeking persons to perform the duties of an employment in the usual and customary way, reasonably be expected to employ him in his present physical condition, and could he reasonably be expected to perform the duties of the employment?

■ We conclude that there was competent and substantial evidence before the Commission tending to show that claimant could not reasonably expect employment in any line of business where the duties to be performed were those customarily performed by the average person engaged in the employment sought, and that he was totally disabled within the meaning of the statute.

Appellants next contend there was no competent and substantial evidence to support the award of the Commission to claimant's wife for nursing services in the amount of $40 per week, and that the Commission failed to make a finding as to how it arrived at such allowance.

■ Findings of fact are required by Sections 287.460 and 287.490 RSMo 1949, V.A.M.S. One of the questions on appeal, as provided by Section 287.490, is whether the facts found by the Commission support the award. The findings of fact should be sufficient to show how the controlling issues have been decided. Otherwise, the reviewing court will be unable to know what the Commission has really determined in order that it may know what to review, and whether or not correct rules of law have been applied to facts which could properly be found on

the particular record. See Michler **v.** Krey Packing Company, en Banc, 363 Mo. 707, 253 S.W.2d 136; Coleman v. Hercules Powder Co., Mo.App., 284 S.W.2d 32; Cebak **v.** John Nooter Boiler Works Co., Mo.App., 258 S.W.2d 262; State ex rel. Buttiger **v.** Haid, 330 Mo. 1030, 51 S.W.2d 1008.

Appellants limit their contention of failure to make adequate findings of fact to their statement that (1) There was no finding by the Commission as to how it arrived at its allowance for nursing services, and (2) No finding as to what the evidence was to support that allowance. We note that the Industrial Commission did make detailed findings of fact. Among numerous others, it found (1) that claimant sustained an accident arising out of and in the course of his employment (2) resulting in permanent and total disability (3) "that claimant has been unable to stand or walk since the accident and, therefore, requires nursing services in addition to medical attention", (4) that his wife in June, 1956, left her employment to devote her full time nursing "her total permanent and invalid husband" and that her nursing services will be necessary so long as his invalid condition exists, and that the reasonable value of her nursing services at the time of the hearing before the referee was $40 per week and that future medical, surgical, hospital and nursing services will be required. It specifically retained jurisdiction to review the allowance for nursing services and to raise or lower it as future conditions might warrant.

In our opinion these findings are sufficient to comply with the statutory requirements. The ultimate constitutive facts necessary to our review of the matter appear in reasonable detail. The Commission is not required to state the evidentiary facts upon which its ultimate findings may depend. It is noteworthy that when the referee made substantially

these same findings of fact appellants did not request additional findings as to how the referee arrived at the allowance of $40 per week; nor did they request the Industrial Commission to make any additional findings if they felt such were necessary to clarify the findings and award made.

Is it correct, as appellants contend, that these findings concerning the award of $40 per week to claimant's wife for nursing are not supported by competent and substantial evidence? Section 287.140 subd. 1 RSMo 1949, V.A.M.S., provides that "In addition to all other compensation the employee shall receive and the employer shall provide such * * * treatment, *including nursing,* * * * as the commission by special order may determine to be necessary." (Italic ours.) As stated in Daugherty v. City of Monett, 238 Mo.App. 924, 192 S.W.2d 51, 56: "The statute does not require the employment of a trained graduate nurse. It merely holds the employer liable for 'nursing.'" There can be no doubt on this record but that there was competent and substantial evidence showing that claimant required care above and beyond the services ordinarily performed by a wife for a husband, and that he has a need for general nursing services. Appellants concede that he is permanently partially disabled. There is evidence to the effect that he is a very sick man with a serious heart condition; that he is unable to stand, walk and get around satisfactorily; that he becomes numb and in extreme pain, has frequent blackouts and would fall if unattended; that it is necessary for his wife to be with him constantly, and especially at night to care for him because of his condition.

Nor must the award be set aside because of lack of testimony that the reasonable value of the required nursing

service is $40 per week. We are concerned here with the question of the reasonable value of the ordinary, practical nursing services that are being provided to claimant and that appear to be required by him in the future, as distinguished from professional nursing services calling for special training, skill and efficiency. The members of the Industrial Commission are selected with the thought that they are fully qualified to perform the usual duties of a Commission of its kind and perforce of their duties are highly experienced in their field. See Carr v. John W. Rowan Plastering Co., 227 Mo.App. 562, 55 S.W.2d 727, 728. Certainly the reasonable value of such ordinary services as are in question is a matter of sufficient common knowledge for the Commission in the absence of any specific evidence on the subject to fix and determine, and it is not essential to sustain its determination that specific proof of their reasonable value be made. See and compare, Ashley v. Williams, 365 Mo. 286, 281 S.W.2d 875, 881; Schraedel v. St. Louis Public Service Company, Mo.App., 248 S.W.2d 25, 33. McDonough v. Freund, 323 Mo. 346, 19 S.W.2d 285, 287; In re Hartle's Estate, Mo.App., 236 S.W.2d 40.

Appellant's final contention is that claimant failed to include either in his original or in his amended claim the allegation that he was totally and permanently disabled, or that he was unable to return to any employment; nor did he ever make any request for recovery for nursing services.

■■■■■ The provisions of the Civil Code are not applicable to workmen's compensation proceedings. The Compensation Act itself is an exclusive and complete code and provides for its own procedure. Harris v. Pine Cleaners, Inc., Mo.App., 274 S.W.2d 328, affirmed Mo., 296 S.W.2d 27. Section 287.550 thereof states that all proceedings before the Commission shall be simple, informal and summary, and all provisions are to be liberally construed with a view to the public welfare; and substantial compliance therewith is ordinarily sufficient. Procedural rights are considered as subsidiary and substantive rights are to be enforced at the sacrifice of procedural formality. Schrabauer v. Schneider Engraving Product, 224 Mo.App. 304, 25 S.W.2d 529; Grauf v. City of Salem, Mo.App., 283 S.W.2d 14; Ross v. Joplin Corporation, Mo.App., 229 S.W.2d 303. Vogt v. Ford Motor Co., Mo.App., 138 S.W.2d 684, 686. Proceedings are initiated by the filing of a notice of accident. A claim, or application for a hearing, need be filed only in the case of a dispute, and the Commission must assist the claimant in filing his claim. It need not be signed by an attorney nor state facts sufficient to state a claim for relief or the definite amount of money claimed. The original jurisdiction of the Commission exists irrespective of the amount of the claim and ordinarily is not dependent upon a claimant's statement in a claim. Nor is the amount claimed in a claim conclusive upon either the claimant or the Commission. See Sections 287.010–287.800 RSMo 1949, V.A.M.S.; Gillespie v. American Bus Lines, Mo.Sup., 246 S.W.2d 797, 800. Section 287.420 provides no proceeding shall be maintained unless written notice of the time, place and nature of the injury, and the name and address of the person injured shall have been given the employer, and that no defect or inaccuracy in such notice shall invalidate the same unless the Commission shall find that the employer was in fact misled and prejudiced thereby.

■■■■ Thus the claim or application for a hearing contemplated by the Workmen's Compensation Act does not have to contain the usual elements of a petition in the civil action. However, as stated in Vogt v. Ford Motor Co., supra, 138 S.W. 2d loc. cit. 686, "A sense of fairness and understanding requires that not only an

employer but also the Commission be advised of the nature of the employee's claim."

Respondent's claim for compensation stated, among other things, the "parts of the body injured—back, spine, extremities and internal injuries (and by amendment) neck," "Exact nature of any permanent injury—undetermined", "Total value compensation claimed, as provided by law."

 The form used by him for filing the claim appears to be the usual form provided for that purpose by the Industrial Commission. It follows the somewhat customary practice in its recitations. If appellants desired the written claim to be more specific they could have filed a motion for a more definite statement. All of the testimony as to the injuries, including the heart, and their permanency was introduced in evidence without objection. There was and is no claim that appellants were surprised, misled or unprepared to meet any of the issues. There is ample evidence that the physician they employed to examine and treat claimant, and the hospital records, indicated not only a heart condition but also other injury of such nature that obviously consideration would be given by the Commission to the question of possible total permanent injury and that nursing services might be required. We deem appellants' contention to be without merit.

Thus, upon our review of the record, we have concluded that the award of the Industrial Commission was supported by competent and substantial evidence and was not contrary to the overwhelming weight of the evidence. Further, nothing has been presented which should cause us in any way to disturb that award or the judgment of the circuit court affirming it.

The award of the Industrial Commission as affirmed by the Circuit Court, and the judgment of the Circuit Court are affirmed. It is so ordered.

. All concur.