Rex Edward JEROME,
Appellant/Respondent,

v.

FARMERS PRODUCE EXCHANGE,
Respondent/Appellant.

No. WD 42759.

Missouri Court of Appeals,
Western District.

Oct. 16, 1990.

Edgar S. Carroll & Andrew J. Gelbach, Warrensburg, for appellant/respondent.

John R. Meharry, Kansas City, for respondent/appellant.

Before SHANGLER, P.J., and CLARK and BERREY, JJ.

BERREY, Judge.

This is an appeal pursuant to § 287.495, RSMo 1986. The Labor and Industrial Relations Commission filed its order on November 13, 1989, and appellant, Rex Jerome, filed his appeal on November 28, 1989. On December 7, 1989, the respondent, Farmers Produce Exchange, filed its notice of appeal.

Rex was employed as a truck driver by Farmers in 1981. On December 28, 1981, Rex was driving a Farmers' truck which overturned and as a result Rex was paralyzed from the waist down. His injuries are extensive and permanent. He lost control of his bladder and bowel and lost sensation and movement of his lower extremities. Subsequently, he has been fitted with leg braces and given gait therapy. He has been instructed in the use of a wheelchair. He has learned to take care of his bowel and bladder requirements. In 1986 the

Harrington rods, inserted following the accident, were removed from his back.

In 1983 Rex married Polly. They bought a home in Wichita, Kansas, without a lot of steps and doors. The bathroom was modified for Rex. Although Rex became employed by Coleman Company as a design engineer, it was necessary for him to use an electric three-wheel cart to get about the plant and a wheelchair or crutches when he goes out.

He empties his bladder by using a disposable catheter, usually two or three times a day. Because he has experienced numerous urinary tract infections, he is on sulfa continuously.

His wife, Polly, who had worked in the medical field eight or nine years at the time of the hearing, became a qualified medical assistant as determined by the "Board of Examiners of the Registry of the American Medical Technologists" in 1989. She weekly inspects his urine for signs of infections. She packs in the catheter supplies, weighing thirty to forty pounds when delivered. She helps him to his truck in bad weather and steadies him when he is on crutches and walking on wet or slippery pavement. She checks his blood pressure and temperature weekly. Rex has no sensation in his feet or buttocks. Polly checks his buttocks for sores and treats the dry skin with lotion.

Polly cleans him up when he is incontinent and prepares diets to help control his bowel and bladder functions. Due to occasional spasms in his legs, Polly will massage them. She helps him bathe by washing his buttocks and back. Whenever they are out and encounter bathrooms not equipped for the handicapped, Polly assists him. She also handles getting the wheelchair out of the car. When he falls Polly is the one who gets him up. Rex estimates that Polly spends about three hours each weekday and five hours every Saturday and Sunday assisting him. Extensive cross-examination of Rex was aimed chiefly at the amount of time Polly spent assisting him with his medical problems and the time she would spend helping him up, opening doors, getting in and out of restrooms and performing similar duties.

All three commissioners found that Rex was entitled to nursing care as a result of the work related injury and that his wife Polly was entitled to be compensated for this general nursing care at the rate of $7 per hour. Two commissioners, Fischer and Watkins, arrived at the figure of one hour of care per week. Commissioner Fowler dissented in part, finding that Polly should be paid $7 per hour for twenty-one hours care per week.

Rex appeals the judgment as inadequate because all of the competent evidence supported an award for nursing care of at least twenty-one hours per week. The employer cross-appealed alleging there was not sufficient competent evidence to justify the need for nursing care to support the majority's award. The points will be taken up and addressed together.

Before we enter the clouded arena, the majority award with one amount and the dissent with a different award, the scope of review on appeal as governed by § 287.495, RSMo 1986, must be examined. We must critically examine the record. Our review leads to the inescapable conclusion that the commission's award was not based on the sufficient and competent evidence contained in the record, as a whole. This court has the authority under § 287.495, RSMo 1986 to "modify, reverse, remand for rehearing, or set aside" the commission's award on either of the following grounds:

(3) That the facts found by the commission do not support the award;

(4) That there was not sufficient competent evidence in the record to warrant the making of the award.

The record is replete with the amount and type of care Polly performs for Rex and to fully set it forth again in this opinion would be redundant. Both the majority and dissent agree that nursing care for Rex is required. They differ as to the amount of time required each week to perform the functions.

We must review the record in the light most favorable to the commission's finding. *Nelson v. Consolidated Housing Develop-*

*ment and Management Company, Inc.,* 750 S.W.2d 144, 148–49 (Mo.App.1988); *Swillum v. Empire Gas Transport, Inc.,* 698 S.W.2d 921, 925 (Mo.App.1985). We reverse the commission's award only when that award is not supported by substantial evidence. We will disturb it only if it is clearly contrary to the overwhelming evidence. *Gee v. Bell Pest Control,* 795 S.W.2d 532, 535–36 (Mo.App.W.D.1990).

We are mindful of the caveat expressed in *Wolfgeher v. Wagner Cartage Service, Inc.,* 646 S.W.2d 781, 783 (Mo. banc 1983), which reminds us that, "[t]he fundamental purpose of the Workers' Compensation Law is to place upon industry the losses sustained by employees resulting from injuries arising out of and in the course of employment." Furthermore, § 287.800, RSMo 1986, advises one and all that the Workers' Compensation Law is to "be liberally construed with a view to the public welfare."

In the commission's order of November 13, 1989, they acknowledged *Brollier v. Van Alstine,* 236 Mo.App. 1233, 163 S.W.2d 109, 115 (1942), by holding that the statutory terms "cure" and "relieve" "should be interpreted as meaning giving comfort, aid, help and ease in his suffering." The commission reiterated that terms in § 287.140 should be given their usual meaning and the statute should be liberally construed.

The commission found:

> Mrs. Jerome also checks and keeps track of the claimant's vital signs; examines the claimant for pressure sores; adjusts the claimant's diet as necessary to assist the claimant with proper bowel function; massages cramps and spasms the claimant experiences in his back and legs; and assists claimant in instances where bathroom facilities are not handicap accessible.

> Although the claimant stated that he was able to check his buttocks for pressure sores with the use of a hand mirror prior to getting married, the claimant's wife testified that while she had seen the claimant attempt to check his buttocks by using a hand mirror, he was not able

to do so successfully. Further, based on her seven years experience in the medical field, the claimant's wife testified that she had never seen anyone in the claimant's condition be able to successfully check his own buttocks for pressure sores simply by using a hand mirror. While the claimant may have felt he was capable of performing such a task, we find his wife's testimony to be credible and worthy of belief. It is the Commission that is the sole judge of the weight of the evidence and the credibility of the witnesses. *Welborn v. Southern Equipment Co.,* 395 S.W.2d 119 (Mo. banc 1965).

The examining doctor for the employer found Rex had no "medical need" for nursing care but this opinion was rejected by the commission. The commission held that:

> While the doctor may not feel the care being rendered the claimant is "medically" necessary, we conclude that the evidence shows the claimant does require general nursing care above and beyond the services ordinarily performed by a wife for her husband. *Stephens v. Crane Trucking, Inc.,* 446 S.W.2d 772 (Mo.1969).

The commission found that $7 per hour was a reasonable rate of compensation for those nursing duties.

Farmers offered only the deposition of Dr. James Zarr, and, as the majority of the commissioners noted, his opinion was based upon Rex's responses to his questions and a "quick examination." Zarr found Rex had no "medical need" for nursing care. Zarr did opine that Polly was "performing the duties described to him." The controversy is over the number of hours per week that Polly performs necessary care for Rex. The majority holds that even though the doctor may feel the care being rendered Rex by Polly is not "medically" necessary, the "evidence shows the claimant does require general nursing care above and beyond the services ordinarily performed by a wife for her husband."

It is well recognized that an award based on speculation and guesswork cannot stand. *Brown v. R.J. Brown Co.,* 351 Mo.

**568**

557, 172 S.W.2d 645 (1943). In view of the totality of the evidence demonstrating the many nursing functions that Polly performed the majority decision was not in conformity with the evidence but was speculative. *Stephens v. Crane Trucking, Inc.*, 446 S.W.2d 772, 781 (Mo.1969). In *Stephens*, the wife of the injured employee performed many of the same services that Rex's wife performs for him. *Id.* at 776. The court found "factual support of the award for future nursing services 'above and beyond the services ordinarily performed by a wife.'" *Id.* at 781. She was awarded $15,302 for her services based upon rates of $10 and $6 per day. *Id.* at 773.

Rex testified that Polly aided him from fifteen minutes to thirty minutes each weekday morning and two and one-half hours each weekday evening. Rex further testified Polly helped him about five hours per day on weekends for about twenty-five hours per week.

From this testimony it might be said that Polly only spent 22.25 hours per week helping Rex, assuming arguendo that she spent the lesser amount of time Rex testified to each morning. Nowhere does the one hour figure of the majority appear. The direct examination of both Rex and Polly is replete with the numerous tasks and duties that Polly performs for Rex. This cross-examination of Polly by Farmers offers no succour for Farmers. An award based on speculation will not stand. *Brown v. R.J. Brown Co., supra,* 172 S.W.2d at 646. There was no evidence to support the one hour award. The commission determines the credibility of the witnesses. *Welty v. State Bd. of Chiropractic Examiners,* 759 S.W.2d 295, 298 (Mo.App.1988). It is not fair to speculate on the amount of time Polly spent caring for Rex merely because it does not correspond with the amount of time she testified to. The commission could have found no justification for the nursing duties and denied the claim. However, once they agreed the nursing duties were justified they were required to base their judgment on the evidence and not their speculative idea of how much time Polly spent in care for Rex.

Polly readily acknowledges that Rex can brush his teeth, take a bath with difficulty, shave, and secure his medication. As an aid in obtaining the full flavor of this cross-examination, set forth below are several quoted exchanges typifying the cross-examination:

Q. Mrs. Jerome, you've testified that you check Rex's urine at least once a week; is that correct?

A. Yes.

Q. Is Rex capable of checking his own urine to determine if he has any type of urinary tract infection?

A. Limited he can check it, yes. He can look at the color; he can smell it. He cannot observe it under a microscope and know what he's looking for.

Q. Has Rex ever determined while the two of you were married, to your knowledge, that he had a suspected urinary tract infection?

A. Has he ever? Yes.

Q. And what did Rex do at that time?

A. Went to the doctor.

Q. For treatment?

A. To see if he actually did have a urine infection or if it was something else.

Q. So he is capable of making that determination and taking the necessary steps if it is suspected?

A. Yes.

Q. The vital signs that you take, you're taking what, Rex's blood pressure every week?

A. Blood pressure, pulse, and respiration.

Q. And that's because of a family history of hypertension?

A. Also to keep on top of his current condition?

. . . .

Q. You're just basically using your medical training; is that correct?

A. Yes.

Q. Rex is capable of checking his body for pressure sores; is this correct?

A. He's capable of checking most of his body for pressure sores, not all parts of his body.

Q. Can he check his feet?

A. He can check his feet, his ankles, his legs, his arms, but, of course, he doesn't have any pressure sores on his arms. He cannot check his buttocks area.

Q. He cannot check his buttocks area with mirrors?

A. You'd almost have to be a contortionist and he's have to stand on his head. He sits on his bottom. He has limited use of his legs. For him to stand on his legs would be very difficult, and to check with mirrors, no, that's not possible.

. . . .

Q. How often is Mr. Jerome incontinent, say during an average week?

A. He has been incontinent very irregularly. We have his bowel and his bladder training pretty much under control. He doesn't have incontinence that often. When he eat spicy foods, when he's had too much liquid, maybe he's had a beer, that's when he is incontinent with his urine. When he's had spicy foods, that's when he has incontinence with his bowel.

Q. When was the last time he had incontinence so far as his bowel is concerned?

A. If you're going to say real incontinent, I'll have to say four months ago. He does have bowel on his shorts at least once a week, but it isn't that big of a spot, but there is bowel movement in his shorts about once a week.

Q. Is he able to clean himself up after he's discovered he's had a bowel problem?

A. Yes.

. . . .

Q. Has he ever been out in public where he's had a bowel problem?

A. Yes.

Q. How long ago was that?

A. He has them at work from time to time. That's when I send extra under-garments, some pads that he can put inside his undergarment.

Q. Has he ever had to call you to come to work to clean him up?

A. He's had to call me to bring catheter kits to him.

Q. I'm talking about his bowel movements.

A. No.

Q. The muscle cramps that he experiences, specifically the spasm in the legs and the back, how often does this occur each week,?

A. That depends on how active he's been. I can't say that he has spasms with any regularity. That would be foolish for me to say that.

Q. Once a week possibly? Twice a week?

A. Once a week would be more realistic. Once every two weeks.

Q. Either once every week or once every two weeks?

A. It depends—like I said, it depends on his activity. If he's been doing a lot, I can rub it every night for a month. I'll rub his back every night for a month. If he hasn't been that active, then he doesn't have spasms that often. He gets spasms in warmer weather because we're outside doing more things. When it's cold we're in the house more, so he doesn't have the spasms as often because of his inactivity.

Q. How long do you generally—when he does develop the spasms of the leg or the back, how much time to (sic) you devote to massaging his legs and back?

A. It's hard to put a time on how long you massage someone's back. Fifteen minutes.

. . . .

Q. You indicate that you believe you're providing about three hours per day during the week in services for Mr. Jerome. I would like for you to describe those.

A. I cook for him.

Q. How long does that take you?

A. Hour and a half.

Q. Did you cook for your former husband?

A. Yes, I did.

Q. And your children. Go ahead.

A. What else would you like to know?

Q. You've testified you put in three hours per day in care for Mr. Jerome. We're up to an hour and half. What's the other hour and half?

A. Oh, we're going to get down to minutes and seconds. Okay. I assist him in whatever way he needs me. If he needs for me to massage his back, I'll massage his back. That may take from five minutes to thirty. If he needs assistance into a different area, then I assist him. I don't really see how we can cut care for one person down to minutes and seconds. I take care of Rex.

Q. You put a lot of time into this when you came up with this three hours per day. That's why I'm asking.

A. I have given some thought to it. Actually, I could put in more than that, but I thought that was a reasonable figure. I'm in the home with Rex. When I—I have done home health care. They pay me for the hours I'm there, whether I'm sitting reading a book while the patient rests or whether I'm preparing a meal. It's just that I'm there in the home.

Polly testified that the only way Rex could tell if he had an unplanned bowel movement was the odor. That, on occasion, she would detect it first while he was still asleep. She has also discovered urinary tract infections before Rex noticed them.

The evidence is clearly overwhelming that Polly spends a great deal of time nursing and caring for her husband Rex. Nothing in the record indicates otherwise. A most conservative review fails to substantiate the majority award of one hour nursing care per week.

It is well to note the language of the dissenting commissioner in this unusual case:

Further, I feel compelled to express my outrage at the decision of the majority finding the claimant requires nursing care of only one hour per week. Not only is that conclusion contrary to the overwhelming weight of the evidence, but it is also an insult to this claimant. In my opinion, the only reason the majority granted an award for future nursing care, paltry and insignificant as it is, is they knew a decision to deny nursing care altogether simply would not hold up in a court of law. I would be ashamed to sign my name to this majority decision.

The court reverses the award of the Labor and Industrial Relations Commission and remands for reconsideration upon the entire record.

SHANGLER, P.J., files separate opinion concurring in result.

CLARK, J., concurs in opinion of SHANGLER, P.J., concurring in result.

SHANGLER, Judge, concurring in result.

The order of the Industrial Commission poses as the issue for decision: "whether or not the employee [Jerome] is in need of and entitled to nursing care as the result of his work-related injury." The order decides that Jerome needs such care and that his wife, a certified nurse assistant who regularly performs the service—a species of care above and beyond the kind usually rendered by one spouse to the other—is entitled to compensation for it. The order also decides that Jerome is entitled to compensation for the nursing care at the rate of $7 per hour for one hour each week.

The nature of the nursing care that the husband needs and the wife administers is expressly found in the order of the Industrial Commission and recounted in detail by the principal opinion. It is the same regimen of care that the husband describes and the wife confirms. It is the same regimen of care that the Commission majority finds also from the testimony of the wife, testimony "credible and worthy of belief." It is a kind of needed care, moreover, the Commission determined even as against the contending medical evidence of the employer.

The value of the nursing care that the husband needs and the wife administers is

also expressly found in the order of the Commission. That finding, as do the others essential to decision, rests on the testimony of the wife and on her credibility:

> The employee's wife testified, and there was no testimony to the contrary, that nursing assistants providing the type of in-home care as the employee required, were compensated at the rate of $7.00 per hour.

The Commission adopted that evidence as the value of the nursing care needed and rendered.

The wife testified also, and there was no testimony to the contrary, that she spends some three hours per weekday and five to six hours per Saturday and Sunday at this needed nursing care for her husband. The order of the Commission makes no reference to this testimony, nor enters any finding on that element of the award. It nevertheless determines: "[T]he employee is entitled to compensation at the rate of $7 per hour *for one hour each week.*" The order is conspicuous in that every other element essential to award—the need for nursing care, the extent of that care, the aptitude of the wife to provide it, the hourly cost of such service—rests on the testimony of the wife and on her credibility noticed and found by the Commission. It is only the hours needed to perform that service that the order neither notices in the testimony nor finds. Yet the pages of the record are full of explanations by the wife, and by the husband, of the time she spends for the needed nursing—some 25 hours per week.

I concur with the result of the principal opinion that the award that limits the compensation to one hour per week for nursing care should be reversed. It is contrary to the overwhelming weight of the evidence, even when considered in a light most favorable to decision. *Johnson v. City of Duenweg Fire Dept.,* 735 S.W.2d 364, 366[1] (Mo. banc 1987). I concur also that the final award be remanded to the Commission for reconsideration upon the entire record. § 287.495, RSMo.Supp.1990.

I would remand on another, and cognate, ground. The integrity of a final award as a quasi-judicial exercise by the Industrial Commission amenable to appellate review depends upon findings of fact that explain how the determinative issues were decided. § 287.495.1(3); *Smith v. Ozark Lead Co.,* 741 S.W.2d 802, 811[4, 5] (Mo.App.1987). The number of hours per week of nursing care for which the employee was entitled to compensation was a constitutive element of the award before the Commission for adjudication. It was determined at one hour per week, but no finding explains that element of award, how derived, or from what evidence. To be sure, there is no requirement that a finding give evidentiary detail, but only ultimate fact. *Groce v. Pyle,* 315 S.W.2d 482, 490[8] (Mo.App.1958).

The evidence that the nursing care occupied some twenty-five hours per week was all that there was before the Commission on that issue. It came from the husband and also from the wife. It is the Commission, of course, that passes on the credibility of the witnesses. It may disbelieve the testimony of any witness, even when uncontradicted and unimpeached. *Brown v. Hillhaven Convalescent Center,* 776 S.W.2d 47, 49 (Mo.App.1989). It believed the evidence of the employee as against that of the employer, however, that there was need of nursing care, and attributed that belief to the testimony of the wife. It believed her account of the nursing care performed, but made no allowance for the hours that such labor occupied.

It is for that reason that the award that limits compensation for nursing care to one hour each week is clearly contrary to the overwhelming weight of the evidence. It is for that reason also that a finding that explains the ultimate fact on which that element of the award rests is essential to an informed appellate review.

As the award now stands, the nursing services are compensated for one hour each week—that is, for some nine minutes per day. There is no basis in the record before us, either in the evidence or in the distinctive expertise that attends the adjudications of the Industrial Commission in such

matters, that sanctions that element of the award as lawful.